M. H. VAUGHAN AND J. LANSING SMITH, PARTNERS, T/D/B/A VAUGHAN AND CO. v. WILLIAM G. BROADFOOT, JR. AND CAPE FEAR TELE-CASTING, INC.

(Filed 6 July, 1966.)

**1. Process § 5.1—**

A subpoena *duces tecum* is the process by which a court, in its inherent power, requires any person who can be a witness to produce at the trial, documents, papers, or chattels material to the issue.

**2. Same—**

A subpoena *duces tecum* must describe the document or other items which the witness is required to bring with him to the trial with such definiteness that the witness can identify them without prolonged or extensive search, and will not lie to permit a party to conduct a mere "fishing expedition."

**3. Same—**

The relevancy and materiality of documents required by a subpoena *duces tecum* may be tested by a motion to quash, vacate, or modify the subpoena.

**4. Same;   Bill of Discovery § 3—**

While a subpoena *duces tecum* and a bill of discovery are in some respects analogous, G.S. 8-89 and G.S. 8-90 do not supersede the subpoena *duces tecum,* and the affidavit required for discovery is not required for a subpoena *duces tecum.*

**5. Process § 5.1—　Subpoena duces tecum held properly quashed for want of definiteness.**

In an action by investment dealers to recover commissions due under contract for procuring capital investments by designated persons in a proposed corporate venture, a subpoena *duces tecum* issued by the clerk requiring a corporate officer to bring into court at the trial the corporation's stock book and any and all agreements between the corporation and any persons and entities relating to investments in the corporation, and "all preliminary and final feasibility studies," prognostications, and estimates by consulting engineers of cost of the proposed venture, etc., *held* properly quashed upon motion, since all of the documents requested are not material to the issue and most of the documents desired were not specified.

MOORE, J., not sitting.

APPEAL by plaintiffs from *Morris, J.,* August 1965 Session of NEW HANOVER.

Action upon an alleged contract.

Plaintiffs allege: Defendant W. G. Broadfoot, Jr., and defendant corporation, Cape Fear Telecasting, Inc., employed plaintiffs to secure the financing necessary for the corporate defendant to begin business. The contract provided that plaintiffs were to find persons or entities who would invest capital in the corporation. For this service they were "to be paid a flat brokerage fee of $6,500.00." Plaintiffs performed their part of the contract, but defendants have refused to pay them the agreed compensation. Plaintiffs are entitled to judgment against defendants, jointly and severally, in the sum of $6,500.00. Answering, each defendant denied the alleged indebtedness. They aver that the parties agreed that *if* plaintiffs procured $250,000.00 for defendant corporation it would pay plaintiffs $6,500.00; that otherwise, plaintiffs were to be paid nothing; that plaintiffs made an effort to procure the money but failed; that plaintiffs did introduce a Mr. Sledge to defendant Broadfoot but that after several conferences, Sledge invested the sum of only $20,000.00 in defendant corporation.

On the 23rd day of August, 1965, at the instance of plaintiffs, the assistant clerk of the Superior Court signed a subpoena *duces tecum* requiring W. G. Broadfoot, Jr., president of defendant corporation, to appear at the courthouse in Wilmington on August 24, 1964, to give evidence in this action and to bring with him the following documents:

"1.　Corporate Stock Book of Cape Fear Telecasting, Inc.

2.　Any and all agreements between Cape Fear Telecasting, Inc., or any of its agents, with any and all persons or en-

tities relative to stock purchases or financing, or invest-ments in Cape Fear Telecasting, Inc.

3. Copies of all preliminary and final feasibility studies had by Cape Fear Telecasting, Inc., during months of February and March, 1964.

4. Copies of cash flow prognostications used in determining or attempting to determine financial needs of Cape Fear Telecasting, Inc. during January, February and March, 1964.

5. All estimates by Consulting Engineers of necessary equipment and construction to put Station on air."

On "the ...... day of August 1965," defendants moved to quash the subpoena *duces tecum,* "for that none of the matters and things nor the documents therein set out are material, pertinent, or competent in the trial of this cause, which is one simply for the collection of a commission for the performance of certain duties." At the beginning of the trial, after arguments by counsel, the court allowed this motion. The trial then proceeded. Two witnesses testified for plaintiffs; plaintiff Vaughan and defendant Broadfoot. The latter was examined adversely. Defendants offered no evidence.

The evidence tended to show: Plaintiffs are licensed investment dealers. In February 1964, defendant corporation had a permit from the Federal Communications Commission to operate a telecasting station in the Wilmington area, but it lacked sufficient capital to purchase and install the transmitting equipment required to open the station. Its permit had twice been extended, and it was imperative that the corporation acquire capital by a definite time. Defendant Broadfoot, president of defendant corporation, sought the services of plaintiffs in obtaining the necessary money. As a result of conversations between him and plaintiff Vaughan, plaintiffs agreed to secure investors who would commit themselves to invest, as needed, a total of $250,000.00 in defendant corporation. "In the presence of other satisfactory conditions," defendants were "willing to give up 33⅓% of equity." Plaintiffs were to be paid a flat fee of $6,500.00 if they secured the required capital which the parties then thought plaintiffs could procure from Carolina Capital Corporation in Charlotte. At this point in the negotiations only that one corporation was involved, and it was understood that if plaintiffs did not get the money from it, they were to receive nothing. Defendants cautioned plaintiffs "with respect to shopping the deal."

On the 22nd or 23rd of February, Carolina Capital Corporation declined to make the investment. Thereafter, Vaughan asked Broadfoot's permission to arrange a meeting between him and a Mr. Sledge of Columbus County, who, he thought, might be interested in

investing in defendant corporation. Broadfoot acquiesced and Vaughan brought Sledge to his office. Thereafter, Sledge "brought in" Messrs. Wall and Gibson, and the three men, in return for 33⅓% of the corporation's stock, made an investment in defendant corporation which permitted it to begin construction of the broadcasting station and to acquire the necessary engineering instruments and equipment to go on the air. Their money was not enough by itself, however, to enable the corporation "to go into business," but with it Broadfoot was able to get other capital and a network affiliation (ABC). Plaintiffs have no information as to the amount of money which Sledge and his associates invested with defendants other than defendants' allegation that it was $20,000.00. A tentative agreement had been made at a meeting in Whiteville in March 1964 between Wall, Sledge, and Broadfoot that Sledge and Wall would invest $250,000.00 in return for 40% ownership of the corporation. Plaintiffs do not know the terms of the final agreement. In June 1964, plaintiffs demanded that defendant corporation pay them a fee of $6,500.00 for securing the necessary financing for the station. The demand was refused and, on October 21, 1964, plaintiffs instituted this action against Broadfoot individually and the Cape Fear Telecasting Company, Inc.

During defendants' cross-examination of plaintiff Vaughan, he was asked if he knew that "ABC and RCA had invested $300,000.00 in this Station" and that General Electric had also "put money in new equipment." Counsel for plaintiff then stated to the court: "I renew my motion for my subpoena *duces tecum.*" At no time during the trial did he ask Broadfoot how much money Messrs. Sledge, Wall, and Gibson had put into the business. The motion was denied.

At the conclusion of all the evidence, defendant Broadfoot moved for judgment of nonsuit. His motion was allowed and plaintiffs did not except. As to the corporate defendant, issues were submitted to the jury and answered as follows:

"I. Did the plaintiffs have an agreement with the corporate defendant whereby plaintiffs were to be paid $6,500.00 for services rendered in obtaining investment capital for corporate defendant, as alleged in the Complaint?

ANSWER: No.

II. Did the plaintiffs obtain such capital pursuant to said agreement, as alleged in the Complaint?

ANSWER: No.

III. If so, in what amount is corporate defendant indebted to the plaintiffs?

ANSWER:　................"

From judgment entered upon the verdict, plaintiffs appealed.

*Stevens, Burgwin, McGhee & Ryals by Karl W. McGhee for plaintiff appellants.*

*Aaron Goldberg for Cape Fear Telecasting, Inc., defendant appellee.*

SHARP, J. This appeal presents only the question whether the trial judge erred in quashing the subpoena *duces tecum*. To answer it, we must consider the history and purpose of this process.

The subpoena *duces tecum*, an ancient writ well known to the common law, is the process by which a court requires the production at the trial of documents, papers, or chattels material to the issue. 8 Wigmore, Evidence § 2200 (McNaughton rev. 1961); 58 Am. Jur., Witnesses § 20 (1948); Annot., Subpoena *Duces Tecum*, 128 Am. St. Rep. 755 (1909). See *Carter v. Graves*, 12 N.C. 74. A court in which an action is pending has the inherent power (frequently confirmed by statute) to issue a subpoena *duces tecum* to any person who can be a witness, and the common rule that a party to the suit was not subject to a subpoena *duces tecum* was a corollary to the rule that a party was incompetent as a witness. 97 C.J.S., Witnesses § 25(b), (d) (1957). Except in a few cases, common law courts lacked the power to compel a party to produce his books and papers. These could finally be obtained, however, by a bill of discovery in a court of equity. *Smith v. Russo-Asiatic Bank;* 170 Misc. 408, 10 N.Y.S. 2d 10.

Blackstone considered "the want of a compulsive power for the production of books and papers belonging to the parties" to be the "height of judicial absurdity," for "in the hands of third persons they can generally be obtained by rule of court, *or by adding a clause or requisition* to the writ of subpoena, which is then called a subpoena *duces tecum.*" 3 Blackstone, Commentaries *382 (Emphasis added.) The "writ of subpoena" to which Blackstone referred was the familiar writ of subpoena *ad testificandum,* the process by which the personal attendance of witnesses was compelled. The procedure is described in 2 Saunders, Pleading & Evidence, pp. 1288-89 (5th Am. Ed. 1851): "A copy of the subpoena should be served on the witness personally and the original must be shown though not demanded *(Woodsworth v. Marshall,* 1 C. & M. 87) a reasonable time before the day of trial." In North Carolina today, subpoenas *ad testificandum* may even be served by telephone (G.S. 1-589). When a witness can be found he is not ordinarily served by leaving

VAUGHAN *v.* BROADFOOT.

a copy with him but, so that there may be no mistake as to the document or thing required, subpoenas *duces tecum* continue to be served by copy.

A subpoena *duces tecum* must describe the document or other items which the witness is commanded to bring with him to the trial with such definiteness that the witness can identify them without prolonged or extensive search. Annot., Subpoena *Duces Tecum* — Form — Contents, 23 A.L.R. 2d 862 (1952).

> "A peculiarity of the subpoena *duces tecum* is that, in the nature of things, it must *specify*, with as much precision as is fair and feasible, the *particular documents desired.* This is because the witness ought not to be required to bring what is not needed, and he cannot know what is needed unless he is informed beforehand. It is at this point that most disputes arise, for the specification is often so broad and indefinite that the demand is oppressive and exceeds the demandant's necessities. Courts are constantly called upon to scrutinize and control the scope of these specifications." 8 Wigmore, *op. cit. supra* § 2200(1)(iv).

"Anything in the nature of a mere fishing expedition is not to be encouraged. . . . (A party is not entitled) to have brought in a mass of books and papers in order that he may search them through to gather evidence." *American etc. Co. v. Alexandria etc. Co.,* 221 Pa. 529, 535, 70 Atl. 867, 869, 128 Am. St. Rep. 749, 752.

The law recognizes the right of a witness subpoenaed *duces tecum* to refuse to produce documents which are not material to the issue or which are of a privileged character. *State ex rel. Spokane & E. T. Co. v. Superior Ct.,* 109 Wash. 634, 187 Pac. 358, 9 A.L.R. 157; 58 Am. Jur., Witnesses § 26 (1948); 97 C.J.S., Witnesses, § 25(i) (1957). Nevertheless, "whether a witness has a reasonable excuse for failing to respond to a subpoena *duces tecum* is to be judged by the court and not by the witness." Annot., 128 Am. St. Rep. 755, 773 (1909). "Though he may have valid excuse for not showing it (the document) in evidence, yet he is bound to produce it, which is a matter for the judgment of the court and not the witness." 2 Saunders, *op. cit. supra,* p. 1273.

The approved method of testing the relevancy and materiality of documents required by a subpoena *duces tecum,* and of thwarting a "fishing expedition," is to move to quash, vacate, or modify the subpoena. 97 C.J.S., Witnesses § 25(j) (1957). Such a motion gives the court the opportunity to examine the issues raised by the pleadings and, in the light of that examination, to determine the apparent

relevancy of the documents or the right of the witness to withhold production upon other grounds. An adverse ruling upon movant's motion to quash, however, gives counsel no right to inspect the books, documents, or chattels ordered to be produced at the trial, nor does it determine the admissibility of these items at the trial. The subpoena merely requires the witness to bring them in so that the court, after inspection, may determine their materiality and competency, or so that the witness, by reference to the books or papers, can answer any questions pertinent to the inquiry. *Southern Pacific Co. v. Superior Court*, 15 Cal. 2d 206, 100 Pac. 2d 302, 130 A.L.R. 323; Annot., 128 Am. St. Rep. 755, 779 (1909); 58 Am. Jur., Witnesses § 20 (1948).

> "The subpoena is merely the means whereby the documents or other things required to be produced are brought into court. Even if the opposite party fails in his motion to recall the subpoena *duces tecum*, or fails to make such a motion and the documents are brought into court, their admissibility is to be determined when they are offered in evidence. *Equitable Life Assurance Society v. Mpasstas*, 256 App. Div. 878, 9 N.Y.S. (2d) 221." *Southern Pacific Co. v. Superior Court, supra* at 210, 100 P. 2d at 304, 130 A.L.R. at 326.

When the propriety of a subpoena *duces tecum* is challenged, it is often said that the question is addressed to the sound discretion of the court in which the action is pending. 97 C.J.S., Witnesses § 25(g) (1957).

> " 'But a motion to its discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles'; *United States v. Burr*, Fed. Cas. No. 14,692d. 'Discretion here does not mean that the court has power to refuse the compulsory production of a paper which is material evidence in the case, but that, before compelling its production by a subpoena *duces tecum*, it will sufficiently inquire into the matter to determine if the evidence appears to be material, and, if not satisfied on this point will refuse to issue the writ': *Dancel v. Goodyear Shoe Machinery Co.*, 128 Fed. 753." Annot., 128 Am. St. Rep. 755, 760.

Defendants in this case argue that a subpoena *duces tecum* is governed by the rules applicable to the equitable remedy of a bill of discovery which is incorporated and extended in G.S. 8-89 and 8-90. *Bank v. McArthur*, 165 N.C. 374, 81 S.E. 327. As a prerequisite to an order for pretrial discovery and inspection of documents un-

der G.S. 8-89 and 8-90, the courts, following their own procedure for discovery in aid of a bill of equity, have required the applicant to show by affidavit the necessity for the inspection and the materiality to the issue of the documents sought to be inspected. If the affidavit is insufficient, any order based upon it is invalid. *Manufacturing Co. v. R. R.*, 222 N.C. 330, 23 S.E. 2d 32; *Patterson v. R. R.*, 219 N.C. 23, 12 S.E. 2d 652; *Dunlap v. Guaranty Co.*, 202 N.C. 651, 163 S.E. 750; *Mica Co. v. Express Co.*, 182 N.C. 669, 109 S.E. 853. See also *Bailey v. Matthews*, 156 N.C. 78, 72 S.E. 92, cited in *Bank v. Mc-Arthur, supra*. Since plaintiffs' application to the clerk of the Superior Court for the subpoena *duces tecum* was not accompanied by any affidavit, defendants contend that the clerk was without authority to issue it and that the court was required to quash the subpoena. *Hooks, Solicitor v. Flowers*, 247 N.C. 558, 101 S.E. 2d 320. Plaintiffs' position is untenable. G.S. 8-89 and 8-90 did not supercede the subpoena *duces tecum*. Although the two are in some respects analogous, a subpoena *duces tecum* may not be used as a bill of discovery. 97 C.J.S., Witnesses § 25e (1957); Annot., 128 Am. St. Rep. at 755.

The common law required no affidavit of materiality and necessity from an applicant for a subpoena *duces tecum*. As a result of statutes in some states, however, a subpoena *duces tecum* will not issue except upon a verified application showing its necessity and the materiality and competency of the items which the witness is ordered to produce. 97 C.J.S., Witnesses § 25f (1957); 58 Am. Jur., Witnesses § 22 (1948). In North Carolina, however, in contrast to an order for a pretrial inspection of documents, no affidavits showing the necessity and materiality of the documents subpoenaed is required. Although G.S. 2-16(1) limits the power of the clerk of the Superior Court to compel the production of documents to those which are "material to any inquiry pending in his court," it is the long-established practice of clerks of court to issue subpoenas *duces tecum* as a matter of course upon the oral request of counsel. The issuance of the subpoena is treated merely as a ministerial act which initiates proceedings to have the documents or other items described in the subpoena brought before the court. At the trial, the court will pass upon the competency of the evidence unless the subpoena has been quashed prior thereto. This practice is similar to that in the Federal courts, in that Rule 45(a), Fed. R. of Civ. P. provides: ". . . The Clerk shall issue a subpoena or a subpoena for the production of documentary evidence, which is a subpoena *duces tecum*, signed and sealed but otherwise blank, to a party requesting it who shall fill it in upon service."

Attorneys have customarily used the subpoena *duces tecum* only for the purpose for which it was intended, *i.e.*, to require the production of a specific document or items patently material to the inquiry, or — as indicated by Christian's Footnote 23 to Blackstone's discussion of the process, as a notice to produce the original of a document.

> "Where one party is in possession of papers or any species of written evidence material to the other, if notice is given him to produce them at the trial, upon his refusal copies of them will be admitted; or if no copy has been made, any parol evidence of their contents will be received. The court and jury presume in favor of such evidence; because, if it were not agreeable to the strict truth, it would be corrected by the production of the originals." 3 Blackstone, Commentaries *382 (12th Ed. 1794).

Here, however, plaintiffs' purpose in securing the subpoena *duces tecum* was obviously that of discovery. But where discovery is counsel's objective, he must, before trial, avail himself of the remedies provided by G.S. 8-89 and 8-90. Clearly, the court should not and will not delay the trial while a party examines in detail a corporation's books and records which he has subpoenaed for the day of the trial. Yet plaintiffs argue that the court's action in quashing, on the day of the trial, the subpoena which they had issued the day before trial deprived them of documentary evidence "to effectively prove their case and impeach defendant's testimony." Whether a detailed examination of (1) the corporate defendant's stock book; (2) any and all agreements "between defendant corporation and any and all persons and entities" relating to investments in defendant corporation; (3) "all preliminary and final feasibility studies" (subject undisclosed) had by the corporate defendant during February and March 1964; (4) "cash flow prognostications used in determining or attempting to determine financial needs" of defendant corporation during January, February and March 1964; and (5) "all estimates by consulting engineers of necessary equipment and construction to put Station on air" would have disclosed evidence material to plaintiffs' case we have no idea. Plaintiffs' right to examine the items listed in the subpoena *duces tecum* should have been determined before trial in a proceeding under G.S. 8-89 or 8-90 — not by the judge on the day of the trial. *Prima facie,* plaintiffs' attempt to subpoena the specified records and documents, was a "fishing or ransacking expedition" which the law will not permit either by subpoena *duces tecum* or a bill of discovery. *Griners' & Shaw, Inc. v. Casualty Co.,* 255 N.C. 380, 385, 121 S.E. 2d 572, 575.

The heart of plaintiffs' case was the amount of money which Mr. Sledge (and perhaps Messrs. Wall and Gibson) had invested in defendant corporation. To the extent that items 1 and 2 would have disclosed these sums, those documents were material to the inquiry; but even under G.S. 8-89 and 8-90, plaintiffs would not have been entitled to discover defendants' dealings with other persons. An order of examination is "only in respect to those matters which relate to the action. . . ." *Griners' and Shaw, Inc. v. Casualty Co.,* *supra.* Yet plaintiffs attempted to subpoena the corporate stock book and "any and all agreements between Cape Fear Telecasting, Inc., or any of its agents with any and all persons or entities relative to stock purchases or financing or investments in Cape Fear Telecasting, Inc." Plaintiffs had no legitimate interest in "any and all agreements" of this type. His Honor, with sound legal reason, was not satisfied that the documents plaintiffs sought to subpoena were material to the case. His action in quashing the subpoena will not be disturbed.

Almost certainly, the amount of the investment by Messrs. Sledge, Wall, and Gibson in defendant corporation was a matter within the knowledge of its president, Mr. Broadfoot, who had negotiated with them and whom plaintiffs examined as an adverse witness. Since it was their money which enabled the corporation to begin broadcasting, it is unlikely that he had forgotten the amount they invested. Yet, in the face of the allegation in the answer that this amount was $20,000.00, plaintiffs studiously avoided questioning Broadfoot with reference to this crucial point. Had they asked him for the specific information, and had he hedged, suffered a lapse of memory, or been unable to answer positively, his Honor would, upon motion, doubtless have required the production of the necessary records.

It is also noted that plaintiffs based their right to recover solely upon the express contract which they alleged. Although our practice would have permitted, they offered no evidence, and tendered no issues, with reference to the reasonable value of their services in procuring the investment in defendant corporation attributable to Sledge. *Cline v. Cline,* 258 N.C. 295, 128 S.E. 2d 401; *Gales v. Smith,* 249 N.C. 263, 106 S.E. 2d 164; *Thormer v. Mail Order Co.,* 241 N.C. 249, 85 S.E. 2d 140. They proceeded on the theory that they were entitled to recover $6,500.00 or nothing. The jury answered the issue NOTHING, and in the trial we find

No error.

MOORE, J., not sitting.