STATE OF NORTH CAROLINA v. JOHN EDWARD BURR

No. 179A93

(Filed 8 September 1995)

**1. Jury §§ 150, 226 (NCI4th)— capital trial—jury selection— challenges for cause—denial of rehabilitation—exercise of court's discretion**

The record shows that the trial judge exercised his discretion in denying defendant's *general* pretrial motion seeking to be allowed to attempt to rehabilitate every prospective juror challenged for cause by the State and then properly exercised his discretion in denying defendant's specific requests to rehabilitate three prospective jurors after the State challenged them for cause based on their unequivocal opposition to the death penalty.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

STATE v. BURR

[341 N.C. 263 (1995)]

**2. Jury § 227 (NCI4th)— capital trial—jury selection—death penalty views—conflicting answers—excusal for cause**

Although a prospective juror gave equivocal and conflicting responses to questions about her ability to follow the law impartially because of her death penalty views, the trial court did not err in excusing this prospective juror where some of her responses revealed that she was opposed to the death penalty and that her views on the death penalty would cause her automatically to vote for a life sentence regardless of the circumstances, and her responses showed that she thought her death penalty views would make it difficult for her to follow the law and thus carry out her duties as a juror.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**3. Jury § 142 (NCI4th)— jury selection—question not attempt to stake out juror**

In a prosecution of defendant for the murder of a four-month-old child, the prosecutor's inquiry as to whether a prospective juror could impartially focus on defendant's guilt or innocence regardless of the child's living conditions and lack of motherly care was not an impermissible attempt to ascertain how the juror would vote upon a given state of facts; rather, the question was properly allowed in the exercise of the prosecutor's right to secure an unbiased jury.

**Am Jur 2d, Jury § 284.**

**4. Jury § 148 (NCI4th)— capital trial—jury selection—preference for death penalty—exclusion of question**

Defendant was not precluded from inquiring into whether a prospective juror would automatically vote for the death penalty in violation of the holding in *Morgan v. Illinois*, 504 U.S. 719, where defendant asked the juror whether she had "a preference for the death penalty as opposed to life imprisonment"; the trial court sustained the State's objection to defendant's question as to form and stated that defendant could rephrase the question, but defendant chose not to do so; and defendant was allowed to ask the juror if she would be able to give life imprisonment the same consideration as the death penalty.

STATE v. BURR

[341 N.C. 263 (1995)]

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

5. **Criminal Law § 1322 (NCI4th)— capital trial—jury selection—parole question by prospective juror—instruction on meaning of life sentence not required** .

The trial court did not err by failing to instruct a prospective juror, and the jury panel, on the meaning of a life sentence when defense counsel asked the prospective juror if he would be able to consider life imprisonment as an appropriate penalty for first-degree murder, and the juror replied, "is that without privilege of parole?"

**Am Jur 2d, Trial § 1443.**

6. **Evidence and Witnesses § 304 (NCI4th)— murder of child—misconduct toward child's mother—similarity of circumstances—admissibility to show identity**

In a prosecution of defendant for the first-degree murder of a four-month-old child, testimony by the child's mother and by others concerning defendant's misconduct toward the mother by choking her, bruising various parts of her body with his hands and fingers, and bending her hands behind her back to make her say and do whatever he wanted was admissible under Rule 404(b) to show defendant's identity as the perpetrator of the crime charged where the evidence showed that, at the time of her death, the child victim was covered with bruises similar to those inflicted by defendant upon the mother, including bruises in the shape of fingerprints on the cheek and handprints on the neck; the child suffered fractures in both legs caused by the knees being bent forward; the child suffered fractures in both shoulders inflicted by the arms being bent backward; and the unusual injuries inflicted on the victim were thus particularly similar to those inflicted by defendant upon the mother and the unusual acts which would have caused the victim's injuries were particularly similar to those acts defendant committed against the mother. The probative value of this testimony outweighed any potential for unfair prejudice against defendant. Furthermore, assuming that testimony concerning defendant's threats to kill the mother for infidelity and his pointing of a gun at her was not

competent to show identity, the admission of this testimony was harmless error in light of other competent evidence tending to show that defendant was the perpetrator of the murder. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence § 421.**

**7. Evidence and Witnesses § 701 (NCI4th)— evidence admitted to show identity—sufficiency of limiting instruction**

The trial court's pattern instruction that evidence of defendant's prior misconduct toward the child victim's mother was admitted "solely for the purpose of showing the identity of the person who committed the crime charged in this case, if it was committed," and that the jury "may consider it, only for the limited purpose for which it was received" was sufficient to limit the jury's consideration of this evidence to the issue of identity without defendant's further requested instruction that the jury was not to consider such evidence as evidence of bad character. N.C.P.I.—Crim. 104.15.

**Am Jur 2d, Trial § 1141.**

**8. Evidence and Witnesses §§ 114, 90 (NCI4th)— murder of child—DSS records—inadmissibility to show third-person guilt—impeachment value outweighed**

In a prosecution of defendant for the murder of a four-month-old child, records the Alamance County DSS relating to the one-year supervision and investigation of the child's mother following the child's death were not admissible to show the mother's guilt of the murder where the records showed that the mother was having difficulty in performing her parental duties but contained no evidence that the mother physically abused or acted violently toward her children. Further, any probative value of this evidence to impeach the mother's testimony that she had done nothing wrong to her other children was substantially outweighed by the danger of confusion and undue delay where defendant had been allowed to impeach the mother with evidence similar to the evidence in the DSS records and the evidence in the DSS records would have been merely cumulative. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence §§ 324 et seq.**

**STATE v. BURR**

[341 N.C. 263 (1995)]

## 9. Criminal Law § 261 (NCI4th)— denial of continuance—no violation of rights of confrontation or effective assistance

Defendant's rights of confrontation and effective assistance of counsel were not violated by the trial court's denial of his motion for continuance of his trial for the murder of an infant to give defense counsel the opportunity to evaluate the need for a medical expert to aid the defense and to file motions for the necessary funds where attorneys were originally appointed to represent defendant on 30 August 1991 and 5 September 1991; defendant's attorneys received and copied the district attorney's investigative file, including the victim's medical records; at defendant's request, the trial court removed defendant's court-appointed counsel on 15 December 1992 based on irreconcilable differences with defendant and appointed two other attorneys to represent defendant; the case was originally set for trial on 25 January 1993 but was continued upon defendant's motion to 1 March 1993; defense counsel filed a motion to continue the case for an additional thirty days; the district attorney informed defendant's new counsel on 30 December 1992 that the file containing the complete investigative and medical reports was available to them; the file included the names and addresses of doctors who had treated the victim at two hospitals and the victim's medical records at both hospitals; the district attorney also informed defendant's attorneys about x-rays taken at both hospitals, the persons to contact to observe these x-rays, photographs taken by the medical examiner, and his request that doctors bring to court drawings, charts and models of portions of the victim's body in which injuries were found; and defense counsel thus had access to medical evidence regarding the need for an expert two months prior to the trial. Nor were defendant's rights violated by the denial of his motion for continuance on the ground that counsel did not have adequate time to interview witnesses contained in a DSS report about the victim's mother in order to investigate third-party guilt where the DSS report was referenced in the investigative report and the victim's medical records, both of which were in the file made available to defense counsel prior to January 1993; defense counsel could have requested the full report from DSS at this time; and, in any event, the DSS report did not contain evidence relevant to third-party guilt.

**Am Jur 2d, Continuance § 97.**

**10. Evidence and Witnesses § 1064 (NCI4th)— instruction on nonflight not required**

The trial court did not err in failing to instruct the jury that evidence of defendant's nonflight from the scene may be considered in determining whether the combined circumstances indicate innocence or a showing of nonguilt.

**Am Jur 2d, Evidence §§ 532 et seq.**

**11. Criminal Law § 466 (NCI4th)— jury argument—having witnesses in court—not attack on counsel's competence**

In a prosecution for the murder of a child in which defense counsel read into evidence the report of a hospital social worker about her investigation of the child's death because the social worker, due to a miscommunication, was out of town the day she was to testify, the prosecutor's jury argument concerning the necessity of talking to witnesses before taking a case to court and having the witnesses in the courtroom was not an attack on the competence and professionalism of defense counsel but was an attempt to minimize the effect of the evidence contained in the social worker's report and was not improper.

**Am Jur 2d, Trial §§ 686-688.**

**12. Criminal Law § 465 (NCI4th)— murder trial—jury argument—prior acts by defendant—consideration to show identity**

The prosecutor's argument to the jury in a prosecution for the murder of a child, "Now, who acts with malice, who bends arms, who hits, who chokes, who acts with malice? There he sits," was not an improper misstatement of law that jurors could infer defendant's identity as the perpetrator from his malicious character but was a proper reference to the fact that the jury could consider evidence of defendant's prior acts on the issue of identity.

**Am Jur 2d, Evidence § 423.**

**13. Criminal Law § 465 (NCI4th)— first-degree murder—jury argument—provocation negating deliberation**

The prosecutor's statement in his jury argument in a trial for the first-degree murder of a child that defendant needed to show "adequate provocation" in order to negate deliberation was not an incorrect statement of the law which prevented the jury from properly considering a verdict of second-degree murder. Rather,

the prosecutor was referring to the kind of provocation which is insufficient to negate malice and reduce the murder to manslaughter but is sufficient to incite defendant to act suddenly and without deliberation.

**Am Jur 2d, Evidence §§ 643-647.**

**14. Evidence and Witnesses § 2090 (NCI4th)— murder of child—another child's fear of defendant—relevancy—competency of lay testimony**

In a prosecution for the murder of a child, the mother's testimony that another of her children was scared of defendant was relevant and admissible to demonstrate the state of the familial relationship in the brief period preceding the murder during which defendant resided in the mother's home. Further, testimony by a neighbor that the children "didn't act like kids when [defendant] was around" was rationally based on the witness's perception and was competent to show the relationship defendant had with the children, one of whom was the murder victim. Also, a social worker's testimony that the mother told her that one of her children was scared of defendant was admissible to corroborate the mother's testimony.

**Am Jur 2d, Expert and Opinion Evidence §§ 359, 360.**

**15. Evidence and Witnesses § 2442 (NCI4th)— medical records—subpoena duces tecum**

The proper method for defendant to obtain medical records not in the possession, custody or control of the State is by a subpoena *duces tecum*.

**Am Jur 2d, Witnesses § 24.**

**16. Constitutional Law § 252 (NCI4th)— furnishing of medical and psychological records—motion properly denied**

Defendant's motion for an order requiring that all medical and psychological records of an infant murder victim's mother be made available to defendant by five entities and any other persons providing medical and psychological services to the mother amounted to a fishing expedition and was properly denied by the trial court where defendant contended that DSS files indicated that the mother suffered from depression and her records might

reveal abuse toward her children, but the DSS records contained no evidence that the mother physically abused or acted violently toward her children.

**Am Jur 2d, Criminal Law § 998.**

**17. Criminal Law § 480 (NCI4th)— anonymous telephone call—hypothetical question—communication with juror— inquiry of jury panel not required**

The trial court did not abuse its discretion by failing to conduct an inquiry of the jury panel about an alleged communication between a seated juror and a pastoral counselor during the penalty phase of defendant's capital trial where a local attorney informed the court during· an *in camera* hearing that he had received an anonymous call during the penalty phase from a purported pastoral counselor who asked him a hypothetical question as to whether a juror who has assented to a verdict and is still a juror in the case may thereafter change his verdict; the caller did not indicate where the trial was being held, if not merely hypothetical, or the name of a particular juror; the attorney properly informed the caller that a juror may not impeach the verdict after it has been rendered and received in open court and that the juror should address his questions to the trial judge if the scenario was real; and the *in camera* hearing thus revealed no misconduct by a juror in defendant's trial.

**Am Jur 2d, Trial § 1562 et seq.**

**18. Criminal Law § 416 (NCI4th)— capital sentencing— heinous, atrocious, or cruel aggravating circumstance— jury argument—comparison to facts of published opinions—gross impropriety—absence of prejudice**

Assuming *arguendo* that the prosecutor in a capital trial improperly encouraged the jury to find the especially heinous, atrocious, or cruel aggravating circumstance by comparing the facts in this case with the facts in published N.C. Supreme Court opinions which upheld findings of this circumstance and that this argument amounted to a gross impropriety, defendant failed to show that he was prejudiced by the trial court's failure to intervene *ex mero motu* in light of the overwhelming evidence that the killing was especially heinous, atrocious, or cruel.

**Am Jur 2d, Trial § 610.**

**19. Criminal Law § 461 (NCI4th)— capital sentencing—jury argument—facts not in evidence—absence of prejudice**

Assuming *arguendo* that the prosecutor in a capital trial improperly traveled outside the record during his argument on the especially heinous, atrocious, or cruel aggravating circumstance by stating that he didn't know when injuries to the infant victim's ears occurred but he would "submit to you [the injuries were] probably done prior to the time before the final blow that struck . . . her head," this statement was not prejudicial error in light of the overwhelming amount of evidence that the killing was especially heinous, atrocious, or cruel.

Am Jur 2d, Trial § 632.

**20. Criminal Law § 1326 (NCI4th)— capital sentencing—mitigating circumstances—burden of proof—instruction**

The trial court's instruction on the burden of proof for finding mitigating circumstances did not constitute plain error.

Am Jur 2d, Trial §§ 1441 et seq.

**21. Criminal Law § 1343 (NCI4th)— heinous, atrocious, or cruel aggravating circumstance—instruction not unconstitutionally vague**

The trial court's instruction on the especially heinous, atrocious, or cruel aggravating circumstance was not unconstitutionally vague.

Am Jur 2d, Trial §§ 1441 et seq.

**22. Criminal Law § 1329 (NCI4th)— capital sentencing—jury argument—Issue Three—unanimity for "no" answer**

The prosecutor did not misstate the law when he informed the jury in a capital sentencing proceeding that it had to be unanimous in determining that the mitigating circumstances outweighed the aggravating circumstances before it could answer "No" to Issue Three.

Am Jur 2d, Criminal Law § 609.

**23. Criminal Law § 1323 (NCI4th)— nonstatutory mitigating circumstance—good conduct in jail—mitigating value—instruction**

The trial court did not err by instructing the jury that it could refuse to consider the nonstatutory mitigating circumstances per-

taining to defendant's good conduct in jail if it deemed the evidence to have no mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441, 1444.**

**24. Criminal Law § 442 (NCI4th)— capital sentencing—jury argument—jury as conscience of community**

The prosecutor could properly argue in a capital sentencing proceeding that the jury was the conscience of Alamance County.

**Am Jur 2d, Trial § 569.**

**25. Criminal Law § 452 (NCI4th)— capital sentencing—jury argument—no limit to nonstatutory mitigating circumstances**

The prosecutor's argument in a capital sentencing proceeding that there is no limit to the number of nonstatutory mitigating circumstances that may be submitted was not grossly improper.

**Am Jur 2d, Trial § 572.**

**26. Criminal Law § 1373 (NCI4th)— death sentence not disproportionate**

A sentence of death imposed upon defendant for the first-degree murder of a four-month-old child was not excessive or disproportionate to the penalty imposed in similar cases where defendant was convicted on the theory of premeditation and deliberation; the jury found the aggravating circumstance that the killing was especially heinous, atrocious, or cruel; the infant was cruelly murdered by being shaken and beaten to death; the child had been left in the care of defendant, the mother's live-in boyfriend, at the time of the murder; defendant had the mother's permission to discipline her children and violated a position of trust; defendant refused to take the child to the hospital until the mother threatened to call an ambulance; the child suffered bruises all over her body, including bruises on her neck indicating she had been grabbed "very tightly" around the neck; the child suffered fractures in both legs caused by the knees being hyperextended and fractures in both shoulders inflicted by the arms being pulled backward; the child received a skull fracture from being struck in the side of the head with a blunt object; the child had bleeding behind both eyes which indicated shaken-baby syn-

drome; and the child suffered these injuries over a prolonged period of time.

**Am Jur 2d, Criminal law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Justice WHICHARD concurring in the result in part.

Justice FRYE joins in this concurring opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Stanback, J., at the 1 March 1993 Criminal Session of Superior Court, Alamance County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to the additional judgment imposed for assault on a female and conviction for felony child abuse was allowed 13 July 1994. Heard in the Supreme Court 16 February 1995.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

On 16 September 1991, defendant was indicted for the first-degree murder of Tarissa Sue O'Daniel, who, at the time of her death, was four months old, and in addition was indicted for one count of felony child abuse. These charges were joined for trial with defendant's appeal from a consolidated judgment finding defendant guilty of two counts of assault on a female entered 6 November 1991 in District Court, Alamance County. Following the presentation of the State's case, the trial court granted defendant's motion to dismiss one charge of assault on a female.

On 16 April 1993, the jury returned a verdict finding defendant guilty of the three remaining charges. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. The judge sentenced defendant in accord-

ance with the jury's recommendation regarding the murder conviction and sentenced him to a term of thirty days' imprisonment for the assault on a female conviction. The judge arrested judgment on the conviction for felony child abuse. From these judgments and conviction, defendant appeals.

The State's evidence tended to show the following: Tarissa Sue O'Daniel ("Susie") was born on 1 April 1991 to Lisa Porter Bridges and Bridges' husband at that time, John Wesley O'Daniel. When Susie was a few weeks old, Bridges began having sexual relations with defendant, who was separated from his wife at the time. When Susie was six weeks old, John O'Daniel discovered his wife was having an affair with defendant and told Bridges that he wanted a divorce.

Subsequently, in June 1991, Bridges and her four children moved into a trailer located next to a trailer owned by Bridges' brother, Donald Wade. Near the end of June, defendant moved into the trailer with Bridges and her four children. Bridges testified that when defendant first moved in with her, "[h]e seemed like a pretty good person," but that after a few weeks, he became physically abusive toward her, bending her hands back in a painful manner, threatening her with a gun, bruising her body, and choking her. Bridges testified that she remained with defendant after this abuse because she "was scared of him."

On 24 August 1991, defendant and Bridges argued most of the day over defendant spending the previous night at his wife's house and his refusing to take Bridges to her parents' house. At approximately 6:00 p.m., Bridges' son Scott tripped over a cord while he was carrying Susie. Bridges testified, however, that she examined Susie after the fall and did not find any marks on her body except for some redness on her arm, which disappeared. Bridges further testified that later that evening, while she was sitting on the trailer steps with Susie and defendant was mowing the yard, defendant hit Bridges in her lower back with his fist.

After defendant hit her, Bridges went over to her brother's trailer, where defendant eventually joined her. Defendant and Bridges began arguing again, and Bridges left the trailer with the infant child. Bridges testified that defendant followed her and shoved her in the back while she was holding the child. Bridges also told defendant that he was going to make her hurt the child, but Bridges testified that "he just kept running his mouth" and followed her inside her trailer, still arguing.

Once inside the trailer, Bridges placed Susie in her infant swing located in the living room. Bridges testified that while she was still holding onto the swing, defendant pushed her down onto the couch, almost causing her to knock over the swing. When Bridges attempted to get up from the couch, defendant pushed her down again and told her not to leave the couch. Bridges sat on the couch a few minutes and then stood up and walked down the hallway into her bedroom. Bridges testified that defendant followed her to the bedroom and pushed her onto the waterbed, causing the waterbed to break. Bridges testified that after the waterbed broke, defendant "started talking like everything was fine." Bridges and defendant then began repairing the waterbed.

Bridges testified that as they were repairing the waterbed, Susie began to cry and that defendant told Bridges, "go on up there and get her, that's all in the hell she wants anyway, she is so damned spoiled." Bridges took the child out of her swing and brought her back to the bedroom, where she laid her on the waterbed. After defendant finished fixing the bed, Bridges helped her two sons, Scott and Tony, prepare for bed, while her youngest son, John, Jr., remained at Donald Wade's trailer. Bridges testified that she also "got [Susie] to sleep" and placed her in her "baby bed" located in Bridges' bedroom. Bridges testified that when she placed Susie in her bed, she appeared to be physically fine and that she did not have any marks on her. Bridges then went back to the Wades' trailer to wash the dishes. Bridges testified that when she left her trailer, Scott and Tony were ready for bed, Susie was asleep in her bed, and defendant was working on a plug in the living room.

Bridges' son Scott testified that after his mother left to go to the Wades' trailer, and after he went to bed, he was awakened by "hammer noises." When Scott awoke, he heard Susie crying. Scott testified that he then heard defendant "mumbling" and that, after he heard defendant mumbling, Susie stopped crying.

After approximately forty-five minutes, Bridges returned to her trailer and found Susie in her swing in the living room. Bridges testified that defendant was pacing the floor at this time and that he told her to look at the bruises on Susie. Defendant told Bridges that he had moved the child to the swing after she woke up and that some of the marks were grease. Bridges attempted to wash these marks off but discovered that they were not grease.

Bridges testified that she observed bruises in the child's ears, under her neck, on her arms, and on her legs. Bridges further testified that her eyes did not "look right," that she did not act right, and that she did not smile or respond to anything. According to Bridges, defendant refused to take the child to the hospital, so Bridges called North Carolina Memorial Hospital in Chapel Hill from the Wades' trailer.

After Bridges talked to a person at the hospital, who instructed her to bring the child in to be examined, she told defendant that she would call an ambulance if he did not take her to the hospital, and defendant finally agreed to take Susie to the hospital. Bridges testified that at this time, Susie was "jerking." Bridges also testified that she did not know how to get to Memorial Hospital and that they ended up at Alamance County Hospital. On the way to the hospital, defendant stopped at a gas station for gas.

Susie was admitted to the Alamance County Hospital at 2:55 a.m. on 25 August 1991. Bridges told the examining doctor, Dr. Willcockson, that her son had fallen while holding the child the day before. Dr. Willcockson examined the child and observed that she was unconscious and "poorly responsive." The child's eyes were wandering but did not "have any particular following," and her right eye deviated to the right. Dr. Willcockson observed that the child made no oral sounds and that her movements appeared lethargic. The child had occasional twitching of the eyes, face, and arms, which appeared to be seizures according to Dr. Willcockson. The child's respiratory rate was fast, and she had multiple bruises and swellings all over her head, scalp, ears, face, neck, arms, legs, and main portion of her trunk. Further, the soft spot on the child's head where the bones were forming was bulging, a symptom which Dr. Willcockson testified indicates swelling in the head. Dr. Willcockson also testified that Susie had a "grating feeling" in both arms and legs which meant the bones were grating upon each other and which indicates bone fractures. The X rays revealed that both of the child's arms were broken, as well as both of her thigh bones. The X rays further showed that the child had suffered some posterior rib fractures.

Dr. Willcockson testified that based on the multiplicity of trauma, Bridges' story of another child falling with Susie did not account for the injuries, and he immediately asked Bridges if Susie had been abused, to which Bridges responded in the negative. Dr. Willcockson testified that he "felt that there was such a high suspicion of abuse in

the matter" that he contacted the sheriff's department and social services. Dr. Willcockson further testified that based on the bruising around the head, the seizures, and the bulging of the soft spot, he formed the opinion that the child had suffered some form of "closed head injury."

At 5:15 a.m., the child was transferred by ambulance to the intensive care unit at Memorial Hospital in Chapel Hill. Dr. Azizkhan, who was the chief of pediatric surgery and associate professor of surgery at UNC Medical School at this time, testified that he examined Susie at 6:00 a.m. Dr. Azizkhan testified that Susie had bruising of the neck, particularly on the left side of the neck and a two-centimeter-by-two-centimeter area underneath the mastoid and the mandibular portion of her neck. Dr. Azizkhan observed bruising on the right side of the face that extended onto the ear, circumferential bruising of the right arm, and bruising on the back. Dr. Azizkhan testified that the child's blood pressure "was very low for a baby [her] age" and that she had lost "half of her blood volume" from internal bleeding.

Dr. Azizkhan further testified that the bones of a child Susie's age "are quite malleable and soft" and that "when you see fractures that are of this magnitude in a baby, you know that the amount of force that's been delivered is very significant, much, much greater than from a simple fall." Dr. Azizkhan testified that to inflict the injuries to the child's legs "would require either a severe direct blow or some kind of a snapping activity" and that the fractures to the child's arms "could be from intense grabbing of the arm and torquing and pulling the child's arms backwards." In Dr. Azizkhan's opinion, Susie's injuries were "inflicted" instead of "accidental."

Dr. David Merten, a professor of radiology in pediatrics at UNC Medical School and chief of the section of pediatric radiology at Memorial Hospital, studied the child's X rays and testified at trial. Dr. Merten testified that these X rays revealed fractures in both thigh bones with evidence of early healing. In Dr. Merten's opinion, these leg fractures were eight to nine days old. The X rays also revealed fractures on or near both shoulders. These fractures did not show any signs of healing, and, in Dr. Merten's opinion, they occurred five days later than the leg fractures. Dr. Merten testified that the fractures in the legs "were produced simply by bending the knee with violence, significance [sic] force, forward, and hyperextending [the knees]" and that the shoulder fractures were "inflicted and incurred" by "taking the arms and bending them back." Regarding the injuries to the head,

STATE v. BURR

[341 N.C. 263 (1995)]

Dr. Merten testified that the child had a depressed skull fracture where the skull was actually broken and that the child had suffered injury to the brain underneath this fracture. Dr. Merten testified that this head injury was "a very unusual fracture in a very unusual place" and that "it would take a relatively confined direct blow to that area to produce this type of fracture." Dr. Merten further testified that this head injury occurred within hours before her admission to the hospital in Chapel Hill.

Dr. Michael Byron Tennison, a child neurologist at Memorial Hospital, testified regarding a CT scan done on Susie. Dr. Tennison testified that this scan showed not only a depressed skull fracture, but also "multifocal intercranial injuries" and bleeding behind both eyes. Dr. Tennison testified that bleeding behind both eyes is "highly suggestive of a shaken baby syndrome," which he defined as a "specific kind of injury where the baby has a whiplash kind of injury from being shaken back and forth." Dr. Tennison further testified that, based on the nature of the skull fracture, the child suffered "quite a force . . . by some blunt object" to the side of the head and that it would have taken a great deal of force to cause this fracture.

The trauma team at Memorial Hospital attempted to reduce the swelling of the child's brain, but they could not obtain a consistent response, and, after twenty-four hours, they could not reduce the pressure in the brain. The child was pronounced dead at approximately 6:30 p.m. on 27 August 1991. Dr. Tennison testified that the child died as a result of "multiple trauma to her head that resulted in contusions of the brain and eventually brain swelling and herniation and brain death."

Dr. Karen Chancellor, a pathologist at Memorial Hospital, performed an autopsy of the child. Dr. Chancellor observed multiple bruises on the child's neck that were consistent with marks caused by a hand and bruises on the cheek that were consistent with marks caused by fingers. Dr. Chancellor further observed round bruises on the upper chest area and a round bruise on the back, which bruises, in her opinion, were caused by a blunt object. Dr. Chancellor also observed bruises on the back of the head.

Defendant presented evidence that tended to show the following: Defendant testified that on the evening of 24 August 1991, he mowed the yard at Bridges' trailer until dark. During this time, Bridges was sitting on the back steps with Susie. Defendant denied having a conversation with Bridges or striking Bridges while he was mowing.

Defendant testified that when he finished mowing the yard, he joined Bridges and her children and Donald Wades' daughters, Misty and Christy, at the Wades' trailer and watched television for approximately thirty to thirty-five minutes. Defendant and Bridges were arguing at this time about Bridges going to her parents' house. Defendant testified that Bridges finally "got mad enough [and] went out the door" to her trailer, taking Susie with her. Defendant testified that he remained in the Wades' trailer with Bridges' sons and Wades' daughters.

Defendant testified that after a few minutes passed, he told Scott to tell Bridges that if she wanted to spend the night with her parents, he would take her to their house. Scott left, and, approximately ten minutes later, Bridges returned to the Wades' trailer without Susie. Defendant testified that he told Bridges that he would take her to her parents' house to spend the night. Approximately five minutes later, defendant and Bridges left the Wades' trailer and returned to Bridges' trailer. Defendant testified that he pushed her in a playful manner on the way to her trailer.

Defendant further testified that once they were in Bridges' trailer, he and Bridges went back to the bedroom where the waterbed was located. Defendant testified that at this time, Susie was in her crib in this bedroom. Defendant pushed Bridges onto the waterbed "to have sex," and when he fell on top of her, the bed broke. Defendant and Bridges then attempted to repair the bed. Defendant testified that after they drained the water from the bed and removed the mattress, Bridges went to the Wades' trailer to wash dishes, and he began drilling on the bed. After he started drilling, defendant looked into Susie's crib to see if he had woken her up, and he noticed that her eyes were open. Defendant testified that he stopped drilling, picked up the child, took her into the living room, and put her in the swing, propping up her bottle with a blanket. Defendant wound the swing and pushed it.

Defendant testified that when Bridges returned to her trailer, she helped him put the remaining parts of the bed together. During this time, defendant walked to the kitchen, and he noticed that the swing had stopped and that Susie was holding the blanket with her head over to the side. Defendant returned to the bedroom. Defendant testified that after he and Bridges finished repairing the bed, he took the child out of the swing and brought her back to her crib. As defendant

was putting the child down in the crib, he noticed her diaper was wet, and he told Bridges to change the diaper. Defendant testified that when he picked up the child's legs, her eyes started rolling from one side to the other and that Bridges told defendant that the child was having a seizure. Bridges told defendant that one of her sons was born with seizures and that she knew what to do. Defendant testified that at this time, Bridges shook the child and her eyes stopped rolling. When asked how Bridges shook the child, defendant responded, "[I]t wasn't real hard or nothing." Defendant testified on cross-examination that at this time, he and Bridges took the child into the living room and kitchen where they had a lamp and that he noticed bruises on the child.

Defendant testified that when Susie did not respond to Bridges, Bridges left to call the hospital. Defendant further testified that Bridges returned five minutes later and that he told her that some of the marks on the child could be grease. They wiped the child with a cloth, and some of the marks came off. Defendant testified that he and Bridges then took the child to the hospital, stopping for gas on the way. Defendant denied that the child cried while he was alone with her that night, and he denied that he tried to settle her down or that he beat her.

Defendant also presented evidence, through the testimony of a social worker, that the Alamance County Department of Social Services ("DSS") had received allegations of neglect against Bridges regarding her son Scott on 18 November 1988 and regarding her son Tony on 19 February 1990. On cross-examination, the social worker testified that DSS found the report of neglect regarding Scott to be unsubstantiated, and the social worker testified on redirect that "unsubstantiated" meant that there were "no risk factors to the children in the house." The social worker also testified on cross-examination that in Tony's case, insufficient evidence existed regarding the allegation to open a file.

Colene Faith Flores testified that in August 1991, she went to her friend's house where she observed Bridges with "a little bitty baby." Flores testified that the baby was propped on the couch when she arrived and cried constantly for approximately thirty-five minutes. Flores testified that she then observed Bridges walk over to the baby and "smack" her, stating, "you're driving me crazy." Flores further testified that the baby fell off the couch.

On rebuttal, the State called Flores' ex-boyfriend, James Whitlow, to testify. Whitlow testified that he was with Flores at her friend's house and that at no time did he observe anyone slap the baby off the couch. Whitlow also testified that he had discovered Flores lying to him previously.

## JURY SELECTION ISSUES

### I.

[1] In his first assignment of error, defendant contends that the trial court erred in denying his pretrial motion to examine prospective jurors challenged for cause, thereby "issuing a blanket ruling prohibiting rehabilitation." Essentially, defendant argues that instead of exercising his discretion, the trial judge erroneously relied upon this blanket ruling to deny his request to rehabilitate prospective jurors Barbee, Watkins, and Torain after they were challenged for cause. We disagree.

> We have noted that while defendants can be given the opportunity to rehabilitate a juror, this is not an entitlement; judges are not required to allow a defendant to attempt to rehabilitate jurors challenged for cause. A trial court in its sound discretion may refuse a defendant's request to attempt to rehabilitate certain jurors challenged for cause by the State.

*State v. Skipper*, 337 N.C. 1, 18, 446 S.E.2d 252, 261 (1994), *cert. denied*, —— U.S.——, 130 L. Ed. 2d 895 (1995).

In the present case, the trial judge did not enter a general ruling that, as a matter of law, defendant would not be allowed to attempt to rehabilitate a juror challenged for cause. Instead, the record shows that Judge Stanback exercised his discretion in denying defendant's *general* pretrial motion seeking to be allowed to attempt to rehabilitate *every* prospective juror challenged for cause by the State. Judge Stanback then exercised his discretion in ruling on defendant's specific requests to be allowed to attempt to rehabilitate individual jurors as these requests were made. Judge Stanback based his specific rulings on the individual juror's answers and demeanor.

Judge Stanback specifically acknowledged that the question of whether to allow defendant to attempt to rehabilitate a prospective juror was within the presiding judge's discretion, and, in at least one instance, he allowed defendant to attempt to rehabilitate a prospective juror. Thus, we conclude that Judge Stanback properly exercised

his discretion in denying defendant's specific requests to rehabilitate jurors Barbee, Watkins, and Torain after the State challenged them for cause based on their unequivocal opposition to the death penalty.

"The defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court." *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). In the present case, all three prospective jurors at issue unequivocally expressed an inability to sentence someone to death. Specifically, when asked whether he would vote against a sentence of death, regardless of the evidence, prospective juror Barbee without reservation stated that he would; when asked whether she could vote to return the death sentence, under any set of circumstances, regardless of the judge's instructions on the law, prospective juror Watkins unequivocally answered that she could not; and when asked whether there was any set of circumstances under which he could impose the death penalty, prospective juror Torain answered, "No," regardless of the judge's instructions on the law. Thus, the trial judge did not abuse his discretion in denying defendant's request to attempt to rehabilitate these prospective jurors by further questioning. *See id.*; *accord State v. Green*, 336 N.C. 142, 159-60, 443 S.E.2d 14, 25, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994). Accordingly, defendant's first assignment of error is overruled.

## II.

[2]  Next, defendant contends that the trial court erred in excusing prospective juror Mary Ervin for cause based on her opposition to the death penalty. We disagree.

"The standard for determining whether a prospective juror may be properly excused for cause for his views on capital punishment is whether those views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Syriani*, 333 N.C. 350, 369, 428 S.E.2d 118, 128 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985)), *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). However, "a prospective juror's bias may not always be 'provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially.' " *Id.* at 370, 428 S.E.2d at 128 (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert.*

**STATE v. BURR**

[341 N.C. 263 (1995)]

*denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)) (alteration in original); *accord Wainwright*, 469 U.S. at 424-25, 83 L. Ed. 2d at 852.

The transcript reveals that at the outset, when asked whether she had any feelings about the death penalty that would influence her as a juror, prospective juror Ervin responded, "Yes, sir." When asked whether she was opposed to the death penalty, she again responded, "Yes, sir." Then, when asked whether her feelings about the death penalty were so strong that she could not vote for the death penalty under any set of circumstances, Ervin responded, "I couldn't." Thereafter, Ervin stated that she could abide by the law and that her feelings would not prevent her from following the law. In response to the question of whether she could vote for the death penalty under some circumstances, she stated, "It depends. Yes, in some."

After asking questions regarding other aspects of the trial, the prosecutor then explained the sentencing procedure to prospective juror Ervin and again asked her questions concerning her feelings about the death penalty. The prosecutor asked Ervin if she could recommend defendant be put to death if she were on the jury and the jury determined that the aggravating circumstances outweighed the mitigating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty. Ervin responded, "I couldn't, no."

Prospective juror Ervin later stated, however, that she "could vote for [the death penalty]," and, when asked whether she would automatically vote against the death penalty, she responded, "No." Thereafter, when asked whether she would automatically vote for death or life, Ervin responded, "Automatic vote for life." When told that this response implied that she would automatically vote against the death penalty, Ervin was asked, "Is that your honest answer, that you would automatically vote for life and against the death penalty because of your views?" Ervin responded, "Yes." However, Ervin then responded in the negative to the question of whether her views on the death penalty would "substantially impair [her] in performing [her] duties as a juror in accordance with the judge's instructions and [her] oath as a juror." The prosecutor then stated:

> Well, you've lost me there. [Y]ou say that you could vote for death, but then you tell me you would automatically vote for life and then you say that your views would not impair you in . . . reaching that. I—it can't be all three ways. I need to know where

**STATE v. BURR**

[341 N.C. 263 (1995)]

you stand on this thing. The [c]ourt needs to know. Where do you stand on this?

Prospective juror Ervin responded, "I would vote for the death penalty, yes." The court then called a fifteen-minute recess.

After the court reconvened, the following transpired:

[PROSECUTOR]: All right, Ms. Ervin, again . . . I want to emphasize something here. It's not that there's any right answers or wrong answers. I want you to just be as honest with yourself and with the [c]ourt as you can be, and before we broke I was asking you about your feelings that you had on your views on the death penalty and my question is this: [I]t's very simply this: Are your views on the death penalty such that they will impair substantially, make it very difficult for you to serve on this case?

Ms. ERVIN: Yes, it would be.

[PROSECUTOR]: Okay. [A] little while ago you told me you would automatically vote for life and then you've come back and said well, you think you could vote for death. What I'm asking you [is,] are your views on the death penalty such that it would make it very difficult for you to follow the law if it required that you come to that point where you vote to impose the death penalty?

Ms. ERVIN: Yes, it would be.

[PROSECUTOR]: And along those lines, are you saying that for that reason you believe that you would tend to automatically vote for a life sentence as opposed to a death sentence?

Ms. ERVIN: Yes.

[PROSECUTOR]: Even if you were otherwise satisfied? Is that —

Ms. ERVIN: Yes.

The prosecutor then moved to excuse prospective juror Ervin for cause. Following a discussion outside the presence of the prospective juror, the court ruled:

The [c]ourt has observed the demeanor of the witness in addition to her inconsistent answers to the questions that have been posed to her and in its discretion will allow the challenge for cause for this witness.

**STATE v. BURR**

[341 N.C. 263 (1995)]

Ms. Ervin's equivocal yet conflicting responses exemplify the situation anticipated by the United States Supreme Court in *Wainwright,* where the Court recognized that, in some instances, a prospective juror's bias may not be provable with unmistakable clarity. *Wainwright,* 469 U.S. at 424, 83 L. Ed. 2d at 852. Thus, we defer to the trial court's judgment concerning whether prospective juror Ervin would have been able to follow the law impartially. *See Davis,* 325 N.C. at 624, 386 S.E.2d at 426. Some of Ms. Ervin's responses reveal that she was opposed to the death penalty and that her views on the death penalty would cause her to automatically vote for a life sentence, regardless of the circumstances. Further, those responses show that she thought her views on the death penalty would make it difficult for her to follow the law and thus carry out her duties as a juror. Although there were conflicting responses, we conclude that the trial court did not err in excusing prospective juror Ervin for cause. *See Syriani,* 333 N.C. at 371, 428 S.E.2d at 129.

## III.

**[3]** Defendant also contends that the trial court erred in allowing the prosecutor to question prospective juror Fuller about his ability to overlook certain facts in the case based on the argument that these questions improperly "staked out" the juror. We disagree.

> Counsel may not pose hypothetical questions which are designed to elicit from prospective jurors what their decision might be under a given state of facts. Such questions are improper because they tend to "stake out" a juror and cause him to pledge himself to a decision in advance of the evidence to be presented.

*State v. Jones,* 339 N.C. 114, 134, 451 S.E.2d 826, 835 (1994) (citing *State v. Vinson,* 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated,* 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)), *reconsideration denied,* 339 N.C. 618, 453 S.E.2d 188, *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3907 (1995). "The nature and extent of the inquiry made of prospective jurors on *voir dire* ordinarily rests within the sound discretion of the trial court." *State v. Hill,* 331 N.C. 387, 404, 417 S.E.2d 765, 772 (1992), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied,* —— U.S. ——, 123 L. Ed. 2d 503 (1993). Thus, "[i]n order for the defendant to show reversible error, he must show that the trial court abused its discretion and that he was prejudiced thereby." *Jones,* 339 N.C. at 134, 451 S.E.2d at 835.

In the present case, the prosecutor informed prospective juror Fuller that the evidence may tend to show that the child died from abuse, that she had been subjected to some form of abuse prior to her death, and that the child was not living in "the best of family environment." The prosecutor then asked Fuller if he could

> look beyond the issue of what kind of environment this child was living in, look beyond the issue of the mother and how she may have been caring for her children at the time, and concentrate on what, if anything, this defendant, Mr. Burr, did, concentrate on whether or not he is guilty of killing this child?

Defendant objected, and the court asked the prosecutor to repeat the question. The prosecutor restated the question as follows:

> Notwithstanding the environment, the evidence—how the evidence may tend to show the environment the child was living in or whether or not her mother was fulfilling all of her motherly duties, can you focus, can you view, on whether or not this defendant, Mr. Burr, is guilty or not guilty of killing the child?

Thereafter, the court overruled defendant's objection, and Fuller responded, "Yes, sir."

We do not agree with defendant's assertion that the prosecutor's rephrased question was an impermissible attempt to stake out prospective juror Fuller. The rephrased question did not contain incorrect or inadequate statements of law. Further, the prosecutor's inquiry into whether the prospective juror could impartially focus on the issue of defendant's guilt or innocence, regardless of the child's living conditions and lack of motherly care, was not an impermissible attempt to ascertain how this prospective juror would vote upon a given state of facts. Instead, this question was properly allowed in the exercise of the prosecutor's right to secure an unbiased jury. *See State v. Williams*, 41 N.C. App. 287, 254 S.E.2d 649 (upholding the State's questioning prospective jurors as to whether they could be fair and impartial in a case involving a proposed sale of marijuana), *disc. rev. denied*, 297 N.C. 699, 259 S.E.2d 297 (1979). Defendant's third assignment of error is overruled.

## IV.

[4] In his next assignment of error, defendant contends that the trial court erred by not allowing him to ask one prospective juror, "Do you have a preference for the death penalty as opposed to life imprison-

**STATE v. BURR**

[341 N.C. 263 (1995)]

ment?" In support of his contention, defendant cites to the holding in *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992).

In *Morgan*, "the United States Supreme Court held that a defendant must be allowed to ask a potential juror whether he would automatically or always vote for the death penalty following a defendant's conviction of a capital offense." *State v. Miller*, 339 N.C. 663, 681, 455 S.E.2d 137, 147, *reh'g denied*, 340 N.C. 118, 458 S.E.2d 183 (1995), *petition for cert. filed*, —— U.S.L.W. —— (No. 95-5388, 21 July 1995); *accord State v. Robinson*, 336 N.C. 78, 100, 443 S.E.2d 306, 315-16 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995). As stated by the Supreme Court, a defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case-in-chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Morgan*, 504 U.S. at 736, 119 L. Ed. 2d at 507.

In the present case, the trial court sustained the State's objection to defendant's question as to *form*. Defendant was not barred from asking the question in any form, but instead was told that he "may rephrase" the question, indicating that if properly put, it would be permissible. *See Skipper*, 337 N.C. at 23, 446 S.E.2d at 263. Defendant, however, chose not to rephrase the question. Thus, defendant was not precluded from inquiry into whether this prospective juror would automatically vote for the death penalty in violation of the holding in *Morgan*. In addition, defendant was allowed to ask the prospective juror if she would be able to give life imprisonment the same consideration as the death penalty. Accordingly, we find no error, and defendant's fourth assignment of error is overruled.

## V.

[5] Defendant also contends that the trial court erred in failing to instruct prospective juror Stainback on the meaning of a life sentence. We disagree.

Counsel for the defense asked Stainback if he would be able to consider life imprisonment as an appropriate penalty for first-degree murder, and Stainback replied, "Is that without privilege of parole?" Counsel for the defense then stated:

The judge will have to instruct you with regards [sic] to the life imprisonment or the possibility of life imprisonment. Whether or not he mentioned that or not, would you be able to follow the judge's instructions as they . . . apply to this case?

Prospective juror Stainback answered, "Yes, sir." After asking a few more questions, counsel for the defense accepted Stainback as a juror. Counsel for the defense did not ask the trial court to instruct Stainback or the jury panel on the meaning of life imprisonment. On appeal, defendant argues, however, that the court erred in failing to instruct Stainback, and the jury panel, on the meaning of life imprisonment based on Stainback's response.

"A defendant's eligibility for parole is not a proper matter for consideration by a jury." *State v. Campbell*, 340 N.C. 612, 632, 460 S.E.2d 144, 154 (1995), *cert. denied*, —— U.S ——, 133 L. Ed. 2d 871 (1996). Further, although we have approved the inclusion of the language "life means life" in instructions to the jury in response to inquiries by the jurors about the meaning of a life sentence during their sentencing deliberations, we have not required it. *See id.* Accordingly, we find no error with the trial court's failure to instruct the jury on the meaning of a life sentence on the facts in the present case. Defendant's fifth assignment of error is overruled.

### GUILT/INNOCENCE PROCEEDING

### VI.

[6] Next, defendant contends that the trial court erred in admitting testimony by Lisa Bridges; Donald Wade's wife, Rita Wade; the Wades' daughters, Misty and Christy Wade; and Bridges' son Scott regarding defendant's prior misconduct toward Lisa Bridges. The testimony given by these witnesses tended to show that on numerous occasions, defendant would bend Bridges' hands behind her back to make her say and do whatever he wanted; that on one occasion, defendant bent Bridges' wrist behind her back in an attempt to make her kiss her brother's feet and told her that he "could make that bone pop through the skin"; that on another occasion, defendant threw Bridges up against the wall and choked her, leaving bruises on her neck in the shape of a hand and fingerprints; and that defendant put a gun in Bridges' face and threatened to kill her and any man involved if she were unfaithful to him.

The testimony also included statements that defendant "grabbed [Bridges'] breast[s] and mashed them till he bruised them"; that he bruised her legs; that these bruises were in the shape of thumb and fingerprints; that defendant would grab Bridges' vagina, leaving bruises; and that defendant would tease Bridges and hit her. Scott testified that defendant told Bridges that if she left him, he would kill her.

**STATE v. BURR**

[341 N.C. 263 (1995)]

Defendant also argues that it was error for the trial court to admit testimony by Officer Dan Qualls, Bridges' mother, and Bridges' step-sister corroborating Bridges' testimony regarding defendant's misbehavior by repeating descriptions Bridges had given to them. Defendant contends that all of the testimony regarding defendant's prior misconduct was inadmissible under N.C.G.S. § 8C-1, Rule 404(b). We disagree.

Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey,* 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

> Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also "is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried."

*State v. Bagley,* 321 N.C. 201, 206-07, 362 S.E.2d 244, 247 (1987) (quoting *State v. Morgan,* 315 N.C. 626, 637, 340 S.E.2d 84, 91 (1986)), *cert. denied,* 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

The State contends that the evidence of defendant's prior misconduct was admissible under Rule 404(b) to prove identity. In order for evidence of defendant's prior crimes or bad acts to be admissible to show identity of the perpetrator in the crime charged under Rule 404(b), there must be " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both.' " *State v. Riddick,* 316 N.C. 127, 133, 340 S.E.2d 422, 426 (1986) (quoting *State v. Moore,* 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983)). "However, it is not necessary that the similarities between the two situations 'rise to the level of the unique and bizarre.' " *State v. Stager,* 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991) (quoting *State v. Green,* 321 N.C. 594, 604, 365 S.E.2d 587, 593, *cert. denied,* 488 U.S. 900, 102 L. Ed. 2d 235 (1988)). "Rather, the similarities simply must tend to support a *reasonable* inference that the same person committed both the earlier and later acts." *Id.*

In the present case, defendant was charged with the first-degree murder of Susie O'Daniel, and the State was required to prove the

identity of the perpetrator. At the time of her death, the victim was covered with bruises similar to those inflicted upon Bridges by defendant, including bruises in the shape of fingerprints on the body and handprints on the neck. Specifically, Dr. Chancellor testified that she observed multiple bruises on the neck that were consistent with marks caused by a hand and bruises on the cheek that were consistent with marks caused by fingers.

In addition, the evidence tended to show that the victim's injuries were caused by acts similar to those acts defendant committed against Bridges. Dr. Azizkhan testified regarding the unusual two-centimeter-by-two-centimeter bruise on the child's neck as follows:

> What disturbed me when I looked at her, the two centimeter bruise that was underneath the edge of her mandible, that's a very unusual location for a bruise, except when someone is grabbed very tightly.

> And that also would match the bruising on the other side. It could also account for the child being grabbed around the head and the neck.

Dr. Azizkhan further testified that to inflict the injuries to the child's legs "would require either a severe direct blow or some kind of a snapping activity" and that the fractures to the child's arms "could be from intense grabbing of the arm and torquing and pulling the child's arms backwards." Similarly, Dr. Merten testified that the fractures in the child's legs were produced by bending the knees forward and that the shoulder fractures were inflicted by "taking the arms and bending them back."

Because we conclude that the unusual injuries inflicted on the victim were particularly similar to those inflicted by defendant upon Bridges and because we conclude that the unusual acts which would have caused the victim's injuries were particularly similar to those acts defendant committed against Bridges, we conclude that the evidence of defendant's prior misconduct toward Bridges regarding his choking her, bruising her with his hands and fingers, and bending her arms behind her back was relevant and admissible to show identity under Rule 404(b). See State v. Carter, 338 N.C. 569, 587-88, 451 S.E.2d 157, 167 (1994) (evidence that defendant assaulted an elderly man above his right eye with a piece of cinder block was admissible to show identity in the first-degree murder of a woman occurring eight years later where one cause of the victim's death was blunt

trauma to the head caused by a brick and the primary wound was above the right eye), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 263 (1995); *see also State v. Phillips,* 328 N.C. 1, 14, 399 S.E.2d 293, 299 (evidence defendants had previously chained the victim to a pole in their basement in Chicago was admissible to show identity in the felony child abuse of this victim in North Carolina, as "[t]hese circumstances were similar to the evidence that [the victim] was tied with a dog chain in North Carolina and explained the medical evidence that the serious injury to [the victim's] ankles was caused by their being tightly bound"), *cert. denied,* 501 U.S. 1208, 115 L. Ed. 2d 977 (1991). We also conclude that the trial court properly allowed testimony corroborating Bridges' testimony concerning these prior assaults. *See State v. Marlow,* 334 N.C. 273, 285-86, 432 S.E.2d 275, 282 (1993).

Further, the similarities between defendant's assaults against Bridges and the assault against the victim are highly probative on the issue of identity. Defendant was clearly identified as the one who committed these prior assaults, especially in light of defendant's own testimony regarding the fact that he "would grab [Bridges'] arm and bend it back" and that he bent her wrist back on one occasion and "she got on her knees like she was going to kiss [her brother's] feet." The identity of the perpetrator in this case was the critical issue at trial. Thus, we are satisfied that the probative value of defendant's prior misconduct toward Bridges regarding his choking her, bruising her with his hands and fingers, and bending her arms behind her back outweighs any potential for unfair prejudice against defendant. *See Carter,* 338 N.C. at 589, 451 S.E.2d at 168.

Further, assuming *arguendo* that the admission of the other testimony, concerning defendant's threats to kill Bridges for infidelity and defendant placing a gun in Bridges' face, was error, we conclude that any such error was not prejudicial. "Defendant has the burden under N.C.G.S. § 15A-1443 of demonstrating that but for the erroneous admission of this evidence, there is a 'reasonable possibility' that the jury would have reached a verdict of not guilty." *State v. Gibson,* 333 N.C. 29, 44, 424 S.E.2d 95, 104 (1992), *overruled on other grounds by State v. Lynch,* 334 N.C. 402, 432 S.E.2d 349 (1993). The State's evidence tended to show that the night of the murder, defendant was left alone with the victim and two of Bridges' young sons for forty-five minutes; that before Bridges left, the child appeared to be physically fine, with no marks on her body; that while defendant was with the child, Bridges' eight-year-old son, Scott, was awakened by hammering

and the victim crying; that Scott heard defendant "mumbling" and then the victim stopped crying; that after Bridges returned to the trailer, the victim was covered in bruises and had suffered a blow to the head; and that the child died from these injuries.

This evidence, in addition to the evidence regarding defendant's prior acts that was admissible to show identity, was competent to support a finding that defendant was the perpetrator of the murder, and defendant has failed to show a reasonable possibility that but for the admission of the evidence of defendant's threats to kill Bridges and his pointing a gun at her, the jury would have reached a different verdict. Accordingly, any error regarding the admission of defendant's threats to kill Bridges and his pointing a gun at her was not prejudicial. *See id.* Defendant's sixth assignment of error is overruled.

## VII.

**[7]** Defendant's seventh assignment of error concerns the court's instruction with regard to the evidence of defendant's prior misconduct toward Bridges. Defendant requested an instruction "similar in form to North Carolina Pattern Instruction—Criminal 104.15, to inform the [jurors] that they are not to consider such evidence as evidence of the [d]efendant's character and limiting the purposes for which the jury may properly consider it." The trial court followed the pattern instruction and properly instructed the jurors that the evidence of defendant's prior misconduct towards Bridges was admitted "solely for the purpose of showing the identity of the person who committed the crime charged in this case, if it was committed," and that they "may consider it, only for the limited purpose for which it was received." *See* N.C.P.I.—Crim. 104.15 (1984). The trial court declined to include the extra sentence that the jury was not to consider the evidence as evidence of defendant's bad character.

We conclude that the trial court properly limited the jury's consideration of this evidence to the issue of identity and therefore that the trial court's instruction was in substantial conformity with defendant's request. Defendant's seventh assignment of error is overruled. *See State v. Brown*, 335 N.C. 477, 490, 439 S.E.2d 589, 597 (1994) ("[T]his Court has consistently held that a trial court is not required to repeat verbatim a requested, specific instruction that is correct and supported by the evidence, but that it is sufficient if the court gives the instruction in substantial conformity with the request.").

## VIII.

[8] Next, defendant contends that the trial court erred in excluding evidence contained in records from the Alamance County Department of Social Services concerning the Department's one-year supervision and investigation of Lisa Bridges' family following the child's death. Defendant contends that these records "contained much information which incriminated Lisa" and was relevant and admissible to show third-party guilt, as well as to impeach Bridges' testimony that she had done nothing wrong to her other children. We disagree.

> [W]here the evidence is proffered to show that someone other than the defendant committed the crime charged, admission of the evidence must do more than create mere conjecture of another's guilt in order to be relevant. Such evidence must (1) point directly to the guilt of some specific person, and (2) be inconsistent with the defendant's guilt.

State v. McNeill, 326 N.C. 712, 721, 392 S.E.2d 78, 83 (1990).

> "Evidence which tends to show nothing more than that someone other than the accused had an opportunity to commit the offense, without tending to show that such person actually did commit the offense and that therefore the defendant did not do so, is too remote to be relevant and should be excluded."

State v. Brewer, 325 N.C. 550, 564, 386 S.E.2d 569, 576 (1989) (quoting State v. Britt, 42 N.C. App. 637, 641, 257 S.E.2d 468, 471 (1979)), cert. denied, 495 U.S. 951, 109 L. Ed. 2d 541 (1990).

In the present case, the DSS opened a case file on Lisa Bridges following the death of Susie as required under N.C.G.S. § 7A-544. The records reveal Bridges showed difficulty in keeping counseling appointments for herself and the children, taking her children to the dentist, helping her children at home with school-related work, bathing her children, and being home when her children returned from school; the records contain no evidence, however, that Bridges physically abused or acted violently toward these children. Following the year of supervision, the social worker for the case concluded that the children were "having their minimal needs met" and recommended closing the case. After a thorough review of the DSS records, we find no evidence pointing to the guilt of Lisa Bridges in the murder of the child.

Further, defendant was allowed to impeach Bridges with evidence similar to the evidence contained in the excluded DSS records regarding the lack of cleanliness of Bridges' home and her children, the truancy problem with her children, the fact that DSS had received allegations of neglect against Bridges concerning two of her sons, and a social worker's opinion that Bridges' psychiatric history and relationship with men "suggest[] instability." Thus, the evidence contained in the DSS record would have, for the most part, been merely cumulative, and any probative value for impeachment purposes was substantially outweighed by the danger of confusion and undue delay. N.C.G.S. § 8C-1, Rule 403 (1992). Defendant's eighth assignment of error is overruled.

## IX.

[9] Defendant also contends that the trial court erred by failing to grant his motion for a continuance, thereby violating his constitutional rights to confrontation and to the effective assistance of counsel. We disagree.

> Traditionally, the decision to grant or deny a continuance rests within the discretion of the trial court. *Ungar v. Sarafite*, 376 U.S. 575, 589, 11 L. Ed. 2d 921, 931[, *reh'g denied*, 377 U.S. 925, 12 L. Ed. 2d 217] (1964); *State v. Roper*, 328 N.C. 337, 348, 402 S.E.2d 600, 606, *cert. denied*, [502] U.S. [902], 116 L. Ed. 2d 232 (1991). However, that discretion does not extend to the point of permitting the denial of a continuance that results in a violation of a defendant's right to due process. *See Roper*, 328 N.C. at 349, 402 S.E.2d at 606. This Court has long held that when a motion for a continuance is based on a constitutional right, the issue presented is an issue of law and the trial court's conclusions of law are fully reviewable on appeal.

*State v. Tunstall*, 334 N.C. 320, 328, 432 S.E.2d 331, 336 (1993).

"The defendant's rights to the assistance of counsel and to confront witnesses are guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States and by sections 19 and 23 of Article I of the Constitution of North Carolina." *Id.* "It is implicit in these guarantees that an accused have a reasonable time to investigate, prepare and present his defense." *State v. Harris*, 290 N.C. 681, 687, 228 S.E.2d 437, 440 (1976). Every defendant must " 'be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he

**STATE v. BURR**

[341 N.C. 263 (1995)]

stands charged and to confront his accusers with other testimony.' " *State v. Thomas*, 294 N.C. 105, 113, 240 S.E.2d 426, 433 (1978) (quoting *State v. Baldwin*, 276 N.C. 690, 698, 174 S.E.2d 526, 531 (1970)).

"However, no set length of time for investigation, preparation and presentation is required, and whether defendant is denied due process must be determined upon the basis of the circumstances of each case." *Harris*, 290 N.C. at 687, 228 S.E.2d at 440. "To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense." *Tunstall*, 334 N.C. at 329, 432 S.E.2d at 337. In order to demonstrate that the time allowed was inadequate, defendant must show "how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial of his motion." *State v. Covington*, 317 N.C. 127, 130, 343 S.E.2d 524, 526 (1986).

In the present case, Craig Thompson, an attorney licensed in this State since 1977, was appointed as defendant's trial counsel on 30 August 1991, and attorney Robert Jacobs was appointed to assist Mr. Thompson on 5 September 1991. Mr. Thompson represented defendant at a preliminary hearing on 6 November 1991; received and copied the district attorney's investigative files, including statements from the State's witnesses and the victim's medical records from Alamance County Hospital and Memorial Hospital; and filed eighteen motions in the action.

On 14 December 1992, Judge Weeks held a hearing on defendant's pretrial motions, and, at the end of this hearing, defendant asked the court to remove his court-appointed counsel based on his allegation that they had not communicated with him and that they had not contacted witnesses whom he considered essential to his case. At this time, the trial was scheduled for 4 January 1993, and Judge Weeks took defendant's request under advisement.

The next day, after interviewing defendant again, Judge Weeks removed Mr. Thompson and Mr. Jacobs as defendant's counsel based on irreconcilable differences and appointed Robert Collins and Douglas Hoy to represent defendant. The district attorney then informed Mr. Collins that the case would be called for trial on 25 January 1993. Mr. Collins moved that the trial be continued, and on 4 January 1993, Judge Stanback heard this motion and continued the case until 1 March 1993. On 26 February 1993, Mr. Collins and Mr. Hoy

filed another motion to continue the trial for thirty days, which motion Judge Stanback denied on 1 March 1993.

On appeal, defendant argues that various "unanswered medical questions strongly imply that defendant required a medical expert to assist defendant in the preparation of his defense" and that "he sought a continuance in part to evaluate his need for an expert, to identify a suitable expert, and to file the motions necessary to obtain funds." Defendant also argues that because he did not receive the DSS records regarding Lisa Bridges in a timely manner, he did not have adequate time to interview witnesses contained in these records in order to investigate the issue of third-party guilt. Based on these arguments, defendant contends the trial court erred in failing to grant his motion for a continuance. We disagree.

By letter dated 30 December 1992, the district attorney informed Mr. Collins and Mr. Hoy that the file containing the complete investigative and medical report was available to them, as it had been made available to Mr. Thompson and Mr. Jacobs. Among other things, this file included the investigative report by the sheriff's department laying out the investigation and the witnesses who were interviewed, the names and addresses of the doctors involved at Alamance County Hospital and Memorial Hospital, and the victim's medical records from both hospitals. The district attorney also informed Mr. Collins and Mr. Hoy about X rays taken at both hospitals and about whom to contact in order to observe these X rays. Additionally, in this letter, the district attorney informed Mr. Collins and Mr. Hoy about photographs that were taken by the medical examiner and advised them that he had requested doctors to locate and bring to the court drawings, charts, and models of relevant portions of the body in which injuries were found to illustrate their testimony. Thus, defense counsel had access to the medical evidence containing the necessary evidence they required regarding the need for an expert for two months prior to trial, and having observed the evidence and medical testimony at trial, defendant has had ample opportunity to show how his case would have been better prepared with regard to this evidence had the continuance been granted, or to show that he was materially prejudiced. He has failed to do so.

Further, the DSS report on Bridges was referenced in the investigative report by the sheriff's department as well as in the medical records from Memorial Hospital, both of which were contained in the file made available to defense counsel prior to January 1993. Counsel

for the defense could have requested the full report from DSS at this time. In any event, as we held previously, the file did not contain evidence relevant to third-party guilt. Thus, defendant has also failed to show his case would have been better prepared with regard to this evidence had the continuance been granted or that he was materially prejudiced. Defendant's ninth assignment of error is overruled.

## X.

**[10]** Next, defendant contends that the trial court erred in failing to instruct the jury that defendant did not attempt to flee the scene and that evidence of nonflight may be considered in determining whether the combined circumstances indicate innocence or a showing of nonguilt. We disagree.

> "The general rule is that the defendant in a criminal case is not, for the purpose of showing his innocence, allowed to prove that he refused to take to flight before his arrest or to escape from jail after his arrest, even though offered the opportunity to do so, at least in the absence of any testimony that he had attempted to flee or escape." 29 Am. Jur. 2d, 334, Evidence § 287. Refusal to flee or escape; voluntary surrender.

*State v. Thomas*, 34 N.C. App. 594, 596, 239 S.E.2d 288, 290 (1977), *cert. denied*, 294 N.C. 445, 241 S.E.2d 846, *cert. denied*, 439 U.S. 926, 58 L. Ed. 2d 318 (1978). Admitting evidence of defendant's refusal to flee to prove his innocence " 'would be permitting prisoners to make evidence for themselves by their subsequent acts.' " *State v. Wilcox*, 132 N.C. 1120, 1136, 44 S.E. 625, 630 (1903) (quoting *State v. Taylor*, 61 N.C. (Phil. Law) 508, 513 (1868)). Thus, we conclude that the trial court did not err in failing to instruct the jury on evidence of nonflight. Accordingly, defendant's tenth assignment of error is overruled.

## XI.

**[11]** Defendant next contends that the trial court erred by overruling his objection to the prosecutor's closing argument concerning the failure of Nita Todd, a social worker with Memorial Hospital, to testify. Defense counsel had intended to have Ms. Todd testify for the defense regarding her investigation of the child's death, including her interviews with Bridges and defendant. Because of an apparent miscommunication, however, Ms. Todd was out of town the day she was to testify. Upon defendant's motion, the trial court allowed the

defense to read Ms. Todd's report into evidence. Thereafter, in his closing argument, the prosecutor stated:

> By gum, ladies and gentlemen, I hope that I don't try a case, particularly one as serious as murder, that I don't talk to my witnesses and if you, any of you ever become the victims of crime, which I hope you don't, but if any of you ever do, I think you would hope that I or some other prosecuting attorney would talk to you and to your witnesses before taking your case into the courtroom, because to do anything less would be working an injustice to the victims.

> You've got to make arrangements to have your witness in the courtroom sometimes.

> Now, I'll contrast that, if you will, please, to the testimony of Nita Todd, excuse me, not testimony, to the record of Nita Todd which was read to you.

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

Defendant argues that because "[t]he prosecutor was well aware that defense counsel had made diligent efforts to arrange for Ms. Todd to be present to testify," the prosecutor's argument was a bad-faith attack on defense counsel's competence and professionalism. Our review of the prosecutor's argument in its entirety shows, however, that this statement was not an attack on defense counsel, but rather an attempt to minimize the effect of the evidence contained in the social worker's report, which evidence may have contradicted the testimony by the State's witnesses.

Trial counsel are allowed wide latitude in jury arguments and are permitted to argue the facts based on the evidence presented as well as reasonable inferences to be drawn therefrom. *State v. Morston*, 336 N.C. 381, 405, 445 S.E.2d 1, 14 (1994). Further, " 'prosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred.' " *State v. Abraham*, 338 N.C. 315, 358, 451 S.E.2d 131, 154 (1994) (quoting *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by*

*State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994)).

Viewed in context, we cannot say that the argument complained of in the present case was error. Certainly any error in allowing this argument does not rise to the level of prejudicial error that would require a new trial. *See Green*, 336 N.C. at 186, 443 S.E.2d at 40 (for an inappropriate prosecutorial comment to justify a new trial, the comment must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process' ") (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, *reh'g denied*, 478 U.S. 1036, 92 L. Ed. 2d 774 (1986)). Defendant's eleventh assignment of error is overruled.

## XII.

**[12]** By his twelfth assignment of error, defendant contends that the trial court erred by failing to intervene *ex mero motu* to prevent the prosecutor from misstating the law on two occasions during his closing argument. The first occasion occurred when the prosecutor stated, "Now, who acts with malice, who bends arms, who hits, who chokes, who acts with malice? There he sits." Defendant contends that by this statement, the prosecutor erroneously argued to the jurors that they could infer defendant's identity as the perpetrator of the murder from his malicious character. We conclude, however, that under the facts of this case, the prosecutor's argument was referring to the jury considering evidence of defendant's prior acts to show his identity as the perpetrator of the murder. Based on our holding in section VI of this opinion, the jury could properly consider evidence of defendant's prior acts on the issue of identity, and the trial court did not, therefore, err in failing to intervene *ex mero motu* to prevent the prosecutor from making this argument.

**[13]** The second occasion occurred when the prosecutor stated:

Considering premeditation and deliberation, you may consider one, provocation on the part of the deceased. Susie O'Daniel was a baby, she could not have provoked the defendant unless maybe she was crying and he didn't like it, but that's not adequate provocation.

. . . .

Cool state of blood does not mean an absence of passion. What is referred to is the lack of an adequate provocation. For

instance, I'll give you an example. I go over there and I smack Ms. Rodriquez, the clerk of court. She pulls out a six shooter and plugs me.

Well, my smacking her is not adequate provocation for her to kill me. Although well she may want to, well she might ought to, but ladies and gentlemen it's not under the law, adequate provocation.

But what it does, it reduces the crime from first degree murder to second degree murder because her killing me is in the heat of the passion aroused by sudden and adequate provocation. My smacking her is adequate to reduce it from first to second degree murder. We don't have that situation in this case.

Defendant argues that because "adequate provocation" reduces murder to manslaughter, the prosecutor's statement that defendant needed to show "adequate provocation" in order to negate deliberation was an incorrect statement of the law which prevented the jury from properly considering the verdict of second-degree murder. We disagree.

There are two kinds of provocation relating to the law of homicide: One is that level of provocation which negates malice and reduces murder to voluntary manslaughter. Mere words, however abusive or insulting are not sufficient provocation to negate malice and reduce the homicide to manslaughter. Rather, this level of provocation must ordinarily amount to an assault or threatened assault by the victim against the perpetrator.

The other kind of provocation is that which, while insufficient to reduce murder to manslaughter, is sufficient to incite defendant to act suddenly and without deliberation. Thus, words or conduct not amounting to an assault or threatened assault, may be enough to arouse a sudden and sufficient passion in the perpetrator to negate deliberation and reduce a homicide to murder in the second degree.

State v. Watson, 338 N.C. 168, 176-77, 449 S.E.2d 694, 699-700 (citations omitted), reconsideration denied, 338 N.C. 523, 457 S.E.2d 302 (1994), cert. denied, —— U.S. ——, 131 L. Ed. 2d 569 (1995). Based on the foregoing, we conclude that defendant's argument is without merit and that the trial court did not err in failing to intervene ex mero motu to prohibit the prosecutor's argument. Defendant's twelfth assignment of error is overruled.

## XIII.

**[14]** Defendant's thirteenth assignment of error concerns the admission of testimony that Bridges' son John, Jr. ("J.J.") was scared of defendant. Defendant filed a motion *in limine* to exclude this evidence, and the trial court denied defendant's motion, reserving the right to address defendant's specific objections when, and if, the State offered such evidence. Defendant did not except to the trial court's ruling.

At trial, the State asked Lisa Bridges, "Did you notice how your children behaved around [defendant]?" Bridges responded, "Well, the other ones, they wouldn't really say nothing about him, but J.J., he was scared of [defendant]." Defendant neither objected to this testimony nor moved to strike Bridges' answer. Defendant has failed, therefore, to preserve his right to appellate review of this issue. Thus, this assignment of error is reviewable only under the plain error rule. *State v. Rush*, 340 N.C. 174, 179-80, 456 S.E.2d 819, 822-23 (1995). "In order to prevail under plain error analysis, defendant must first establish that the trial court committed error and then show that 'absent the error, the jury probably would have reached a different result.'" *Id.* at 180, 456 S.E.2d at 823 (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

Defendant has failed to show that the admission of this testimony constituted plain error, as it was relevant and admissible to demonstrate the state of the familial relationship in the brief period preceding the murder in which defendant resided in the home. *See State v. Lynch*, 337 N.C. 415, 424, 445 S.E.2d 581, 585 (1994). Defendant also argues, however, that the testimony by Misty Wade and social worker Brownlee Cable that J.J. was scared of defendant was also inadmissible. Misty Wade did not, however, testify that J.J. was scared of defendant. Instead, the State asked Misty what she had observed about the behavior of Bridges' children when defendant was around, and Misty testified, over objection, "Their behavior, they had—they didn't act like kids when [defendant] was around." This opinion testimony was rationally based on the witness' perception and was helpful to show the relationship defendant had with Bridges' children, one of whom was the murder victim. Admission of this testimony was, therefore, not error. *See State v. Baker*, 338 N.C. 526, 555, 451 S.E.2d 574, 591 (1994) (opinion testimony by lay witness admissible as an inference rationally based on the perception of the witness and helpful to the determination of a fact in issue). Defendant failed to object

to the remaining testimony by Misty that was admitted regarding the behavior of Bridges' children, and defendant has failed to show that the admission of this testimony amounts to plain error.

Finally, defendant called social worker Brownlee Cable to testify about her investigation of the murder, including her interviews with Bridges and defendant. On cross-examination, the State asked Cable if Bridges told her during her interview "that the kids were frightened of [defendant]." Over objection, Cable responded, "At that time she told me that J.J. was scared of [defendant]." This evidence was admissible to corroborate the prior testimony of Bridges. *See Marlow,* 334 N.C. at 285-86, 432 S.E.2d at 282. Defendant's thirteenth assignment of error is overruled.

## XIV.

Next, defendant contends that the trial court erred in denying his motion to order that Lisa Bridges' medical records be made available to the defense. Defendant has failed, however, to make these documents part of the record on appeal. It is incumbent on defendant to provide a complete record for appellate review. Because defendant failed to include these documents in the record, we cannot review this assignment of error.

[15] "[T]here is no statute that grants a defendant in a criminal trial access as of right to any documents unless they are 'within the possession, custody, or control of the State.'" *State v. Newell,* 82 N.C. App. 707, 708, 348 S.E.2d 158, 160 (1986) (quoting N.C.G.S. § 15A-903(d)). In the present case, the documents at issue were not in the possession, custody, or control of the State. Thus, a proper method for obtaining these records would have been through the use of a subpoena *duces tecum. See State v. Love,* 100 N.C. App. 226, 395 S.E.2d 429 (1990), *dismissal allowed and disc. rev. denied,* 328 N.C. 95, 402 S.E.2d 423 (1991).

> The subpoena *duces tecum* is the process by which a court requires that particular documents or other items which are material to the inquiry be brought into court. It is issued by the clerk of court, and can be issued to any person who can be a witness. G.S. 7A-103(1); *Vaughan v. Broadfoot,* 267 N.C. 691, 149 S.E.2d 37 (1966).
>
> The purpose of the subpoena *duces tecum* is to require the production of specific items patently material to the inquiry. *Id.*

Therefore, it must specify with as much precision as fair and feasible the particular items desired. *Id.*

*Newell*, 82 N.C. App. at 708, 348 S.E.2d at 160.

[16] Defendant in the present case did not subpoena the records at issue. Instead, he made a general motion for the court to order five specified entities and "any and all physicians, psychologists, health care providers and any other person providing medical or psychological care to Lisa [Bridges to] make all such records available to the [d]efendant for inspection and/or copying." Defendant's argument that he was entitled to all of Bridges' medical and psychological records because the DSS files revealed that she suffered from depression and therefore her medical and psychological files might reveal that she became abusive toward her children is unpersuasive. As we held in section VIII of this opinion, the DSS records contain no evidence that Bridges physically abused or acted violently toward her children. Thus, defendant's general request for all of Bridges' medical and psychological records could amount to nothing more than a fishing expedition. Accordingly, defendant's fourteenth assignment of error is overruled.

### CAPITAL SENTENCING PROCEEDING

### XV.

[17] Regarding the sentencing proceeding, defendant first contends that the trial court erred in failing to conduct an inquiry of the jury panel about an alleged communication between a seated juror and a pastoral counselor during the jury's penalty proceeding deliberations. Based on the specific facts of this case, we disagree.

"In the event of some contact with a juror it is the duty of the trial judge to determine whether such contact resulted in substantial and irreparable prejudice to the defendant. It is within the discretion of the trial judge as to what inquiry to make." *State v. Willis*, 332 N.C. 151, 173, 420 S.E.2d 158, 168 (1992).

In the present case, the trial court conducted an *in camera* hearing with a local attorney, Mr. Hemrick, regarding the alleged juror communication. Mr. Hemrick informed the court that during the penalty proceeding deliberation of this case, he received a call from an organization known as Pastoral Care and that he had spoken to a person who apparently was a psychologist there. Mr. Hemrick told the court that this alleged psychologist told him that he wanted to ask

him a "hypothetical question about a trial situation." The question was "may a juror who has assented to a verdict who is still a juror in the case . . . change their [sic] verdict after they've [sic] rendered a verdict." Mr. Hemrick informed the caller that the only thing he knew about the law in North Carolina was "that a verdict cannot be assailed after it[']s a verdict." Mr. Hemrick also informed the caller, however, that if the question were not hypothetical, if he had a client who was sitting on a panel who had changed his or her mind, then

> that person should address their questions to the trial bench, should have a written question addressed to the trial bench, should inform the foreman, first of all, that the juror wants to have a conference or a written communication with the trial judge.

Mr. Hemrick further informed the court that the caller did not indicate in what state or city this "hypothetical" trial was located, if in fact the trial was not hypothetical.

We conclude that the trial court did not abuse its discretion in failing to conduct an inquiry of the jury regarding this communication. The trial court properly conducted an interview with Mr. Hemrick, and nothing in this interview revealed any juror misconduct. The caller presented the scenario in the hypothetical and did not indicate where the trial was being held, if indeed it was not a hypothetical, nor did the caller indicate the name of the particular juror. Further, Mr. Hemrick properly informed the caller of the law in North Carolina that "a juror may not impeach the verdict of the jury after it has been rendered and received in open court," *State v. Martin*, 315 N.C. 667, 685, 340 S.E.2d 326, 336 (1986), and instructed him to tell the juror to address his questions to the trial judge, if the scenario was real. Under these circumstances, we cannot say that this anonymous phone call and hypothetical scenario evinced juror contact in the present case which resulted in substantial and irreparable prejudice to defendant so as to require the court to conduct an inquiry of the jury panel. Accordingly, defendant's fifteenth assignment of error is overruled.

## XVI.

[18] By his next assignment of error, defendant contends that he is entitled to a new sentencing proceeding because the prosecutor improperly referred to this Court's decisions in *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds*, 497 U.S.

1021, 111 L. Ed. 2d 777 (1990), *on remand,* 328 N.C. 532, 402 S.E.2d 577 (1991), and *State v. Huffstetler,* 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 169 (1985), to bolster his argument that the jury should find that the murder was especially heinous, atrocious, or cruel. Because defendant failed to object during the closing arguments, "he must demonstrate that the prosecutor's closing arguments amounted to gross impropriety." *State v. Rouse,* 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *reconsideration denied,* 339 N.C. 619, 453 S.E.2d 188 (1995), *petition for cert. filed,* ⸺ U.S.L.W. ⸺ (No. 94-9360, 19 May 1995).

Defendant refers to the following statements by the prosecutor:

1989 case, *State v. Huff,* and this is a case involving the killing of an infant. The North Carolina Supreme Court wrote, "a finding that this aggravating circumstance, especially heinous, atrocious and cruel, exists and only is permissible if the level of brutality involved exceeds that normally found in first degree murder or when the first degree murder in question is conscienceless, pitiless or unnecessarily torturous to the victim."

The Court went on to write, the killing of the infant was conscienceless, pitiless, and unnecessarily torturous to the victim when the facts tend to establish that the killing or when the facts tend to establish the killing was both conscienceless and pitiless.

And then finally, another case by the North Carolina Supreme Court and this is [a] 1984 case, *State v. Hufstettler* [sic], the Court writes, "we decline to limit the definition of especially heinous, atrocious or cruel murder to include only those which involve physical injury or torture prior to death."

. . . .

What the Court is saying in its opinion is that we decline to limit the definition of especially heinous, atrocious or cruel murder to include only those which involve physical injury or torture prior to death. In other words, the Court is saying you don't have to decide which injury was first, in determining whether this was especially heinous, atrocious or cruel killing. That is not the issue.

The Court goes on to write, we have upheld the submission of this aggravating circumstance even though the evidence did not

establish at what point during a brutal attack[] the victim's death or unconsciousness occurred.

So the North Carolina Supreme Court has answered that question for you. It doesn't matter if the first injury, the middle injury or the last injury was the one which caused her to lose consciousness, that is not an issue in deciding if the circumstance exists.

The Court went on to say, we hold the evidence presented by the State in present cases for submission would permit the jury to consider whether the murder of the victim, whose name was Edna Powell, was especially heinous, atrocious or cruel.

"Edna Powell died as a result of being battered to death by what could only have been a prolonged series of blows, blows from a cast iron skillet, so severe as to fracture her skull, neck, jaws and collarbone.["]

"And it caused her skull to be pushed into her brain. The severity and the brutality of the numerous wounds inflicted amply justified the submission of this aggravating circumstance to the jury."

Ladies and gentlemen, that's an important case. It's an important case in the context of the one that is before you. Why do I say that?

Let's think about it. In determining the appropriate sentence the Judge will tell you you may rely not only [on] the evidence that you heard in this sentencing hearing, the witnesses that were called yesterday, but you may rely on all the evidence which you have previously heard. And as you may recall at yesterday's sentencing hearing I announced at the outset that we would rely upon the previous presentation of evidence.

Both cases, the one dealing with Mr. Huff, the infant who died, and . . . the present case involved the death of infants. Both cases involved the killings which demonstrated a lack of conscience, a pitiless crime. Likewise that last case that I just read to you for [sic] *Huffstetler* case, demonstrates lack of pity, lack of conscience.

In all those cases and in the present case we're dealing with multiple injuries. Susie certainly had multiple injuries . . . .

Defendant argues that by these statements, the prosecutor encouraged the jury to find the especially heinous, atrocious, or cruel aggravating circumstance based on the fact that other juries had found this circumstance in factually similar cases and because this Court reviewed those decisions favorably. In so doing, defendant contends that the prosecutor violated the prohibition enunciated in *State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986), that "counsel may not read the facts contained in a published opinion together with the result to imply that the jury in his case should return a favorable verdict for his client."

It is, however, "permissible for counsel in argument to state his view of the law applicable to the case on trial, to read published decisions of this Court in support thereof, and to recount some of the facts on which those other decisions were based." *State v. Laws*, 325 N.C. 81, 115-16, 381 S.E.2d 609, 630 (1989) (citing *Wilcox v. Motors Co.*, 269 N.C. 473, 479, 153 S.E.2d 76, 81 (1967)), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, 502 U.S. 876, 116 L. Ed. 2d 174, *reh'g denied*, 502 U.S. 1001, 116 L. Ed. 2d 648 (1991). Assuming *arguendo* that the prosecutor's unobjected-to reading from *Huffstetler* and *Huff* and argument in this regard were so grossly improper as to require the trial court to intervene *ex mero motu*, we nevertheless conclude that defendant has failed to show any resulting prejudice in light of the overwhelming evidence of this aggravating circumstance introduced at trial. *See Laws*, 325 N.C. at 116, 381 S.E.2d at 630.

"A murder is [especially] 'heinous, atrocious, or cruel' when it is a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *Rouse*, 339 N.C. at 97, 451 S.E.2d at 564 (quoting *State v. Goodman*, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979)). Evidence of a "prolonged brutal attack inflicting injuries beyond what would be necessary to kill the victim" may be considered in determining the existence of this aggravating circumstance, *Laws*, 325 N.C. at 114, 381 S.E.2d at 628, as well as the victim's age and the existence of a parental relationship between the victim and defendant, *see Huff*, 325 N.C. at 56, 381 S.E.2d at 667.

In the present case, the murder victim was a defenseless four-month-old baby who was left in the care of defendant at the time of the murder. Defendant had been living in the child's home for approximately half of the child's life in a relationship with the child's mother,

and testimony by Bridges that she had given defendant permission to discipline her children tends to show that he had taken on a parental role in the family. Thus, defendant's murder of this defenseless child was not only pitiless, but it also betrayed the special role which defendant had been given in the family.

The evidence also supports a finding that the injuries inflicted upon the child were numerous, going beyond what would be necessary to kill the victim, and brutal. The medical evidence and testimony showed that the child suffered bruises all over her body, including bruises on her neck, which indicated she had been grabbed "very tightly" around the neck, and bruises on her arms, ears, torso, and legs. Both of the child's arms and legs were broken, which injuries would have required a great amount of force to inflict. The breaks in her arms could have been caused by "intense grabbing of the arm and torquing and pulling the child's arms backwards," and the breaks in her legs were produced by hyperextending the knees "with violence [and] significan[t] force."

Further, the child suffered from a fracture to the skull, which indicated that "quite a force [was] delivered by some blunt object to [the] side of the head," as well as multifocal intercranial injuries and bleeding behind both eyes, which would have been caused by repeated shaking of the child, and which resulted in the child's "brain [being] slosh[ed] essentially inside of the skull" and "pounded against the bones of the skull." The evidence also showed that the child suffered injuries over a prolonged period of time, as the breaks in her legs were eight to nine days old, and that she would have been conscious from "minutes to an hour or so" following the infliction of injuries, during which time she would have experienced severe pain. In light of this overwhelming evidence that the killing was especially heinous, atrocious, or cruel, we conclude that defendant has failed to show any prejudice resulting from any error by the trial court in failing to intervene *ex mero motu* to prevent the prosecutor's argument.

Furthermore, the trial court subsequently instructed the jurors that it was their duty to decide from all the evidence presented that the aggravating circumstance existed, and in his closing argument, defense counsel was also allowed to argue the facts in *Huff* to defendant's advantage. Defense counsel argued:

> Finally, [the prosecutor] talked to you about the case *State v. Huff* and mentions a child, and read to you parts about the pitiless, conscienceless nature of what Mr. Huff did to the child.

He neglected to mention to you what Mr. Huff did do to this child was to take his nine-month-old baby out into the woods and dig a hole about two feet deep and put the baby in the hole and slowly covered her up while she was alive. Again, that was a very cold-blooded, conscienceless, hideous act. I submit to you that's not an act that we have in this situation.

Defendant's sixteenth assignment of error is overruled.

## XVII.

**[19]** In his next assignment of error with regard to the prosecutor's sentencing argument, defendant contends that the trial court erred in allowing the prosecutor, over defendant's objection, to state, "I don't know when that was done, [the injuries to the victim's ears,] but I would submit to you [the injuries were] probably done prior to the time before the final blow that struck to [sic] her head." Defendant contends that by this statement, the prosecutor was allowed to improperly travel outside the record and postulate on the order in which certain injuries were inflicted upon the victim. Defendant argues that this error prejudiced him by increasing the likelihood that the jury would find the especially heinous, atrocious, or cruel aggravating circumstance. Based on the overwhelming amount of evidence that the killing was especially heinous, atrocious, or cruel, assuming *arguendo* the admission of this statement was error, any such error was necessarily harmless beyond a reasonable doubt. Defendant's seventeenth assignment of error is overruled.

## XVIII.

**[20]** In his next assignment of error, defendant contends that the trial court's instruction on the burden of proof for finding mitigating circumstances, to which defendant failed to object, constituted plain error. However, the instruction given in this case is the same instruction we held did not constitute plain error in *State v. Payne*, 337 N.C. 505, 531-32, 448 S.E.2d 93, 108-09 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). Further, defendant's arguments in support of his assignment of error are the same arguments we rejected in *Payne*. Defendant's eighteenth assignment of error is overruled.

## XIX.

**[21]** Next, defendant contends that the trial court's instruction with regard to the aggravating circumstance, especially heinous, atrocious, or cruel, was unconstitutionally vague. Because defendant

failed to object to this instruction, he is entitled to relief only if plain error occurred. *Id.* at 530, 448 S.E.2d at 107.

Except for a sentence requested by defendant, that "[t]his aggravating circumstance is limited to acts done during the commission of the murder," the instruction given by the trial court in the present case is identical to the instruction we upheld as providing "constitutionally sufficient guidance to the jury" in *Syriani*, 333 N.C. at 391-92, 428 S.E.2d at 140-41, and defendant has presented this Court no reason to reexamine our holding. Accordingly, defendant's nineteenth assignment of error is overruled.

## XX.

In his twentieth assignment of error, defendant contends that the trial court erred by failing to prevent the prosecutor from misstating the law on two occasions during his closing argument. Defendant first refers to the prosecutor's argument set out in section XVI of this opinion. Based on our holding in that section, we conclude any error was not prejudicial.

[22] The second argument to which defendant refers occurred during the prosecutor's explanation of Issue Three of the capital sentencing procedure. The prosecutor argued:

> The third issue, is—are the mitigating circumstances insufficient to outweigh the aggravating circumstances?
>
> . . . .
>
> You must make a determination whether or not these mitigating circumstances beyond a reasonable doubt, are insufficient to outweigh this aggravating circumstance. Again, your finding as to this, if you find that the mitigating are sufficient to outweigh the aggravating, your finding must be unanimous, all twelve of you must agree to it.

Defendant argues that the prosecutor misstated the law when he informed the jury that it had to be unanimous in determining that the mitigating circumstances outweighed the aggravating circumstances before it could answer "No" to Issue Three. What the prosecutor argued, in essence, is that if the mitigators did not outweigh the aggravators, then a "Yes" answer required unanimity. On the other hand, if the mitigators did outweigh the aggravators, then a "No" answer by the jury to Issue Three required unanimity.

For the reasons set forth in *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), and *State v. McLaughlin*, 341 N.C. 426, 462 S.E.2d 1 (1995), we conclude that the prosecutor did not misstate the law, and this assignment of error is overruled.

## XXI.

**[23]** Relying on *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1 (1986), defendant next contends that the trial court erred in instructing the jury that it could refuse to consider the nonstatutory mitigating circumstances pertaining to defendant's good conduct in jail if it deemed the evidence had no mitigating value. We recently decided this issue against defendant's position in *State v. Basden*, 339 N.C. 288, 451 S.E.2d 238 (1994), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3891 (1995).

In *Basden*, we concluded that "*Skipper* does not require this Court to overrule its precedents holding that jurors are allowed to reject any nonstatutory mitigating circumstance which they do not deem to have mitigating value." *Basden*, 339 N.C. at 304, 451 S.E.2d at 247. Instead, the issue in *Skipper* was whether the exclusion from the sentencing hearing of defendant's evidence regarding his good behavior in jail deprived him of his right to place before the sentencer relevant evidence in mitigation of punishment. Here, defendant was allowed to place such evidence before the jury. Accordingly, we conclude that the trial court did not err in its instruction on the nonstatutory mitigating circumstances pertaining to defendant's good conduct in jail. *See Basden*, 339 N.C. at 304, 451 S.E.2d at 247.

### PRESERVATION ISSUES

Defendant raises four additional issues which he concedes have recently been decided against defendant's position by this Court: (1) the trial court erred in denying defendant's motion to prohibit the State from death-qualifying the jury; (2) the trial court erred in instructing the jurors they must consider whether the nonstatutory mitigating circumstances have mitigating value; (3) the trial court erred in instructing the jury that at Issues Three and Four, each juror "may" rather than "must" consider any mitigating circumstance found by the juror in Issue Two; and (4) the trial court erred in instructing the jury that it should answer Issue Three "yes" if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance.

We have considered defendant's arguments on these issues, and we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

**[24]** Defendant also asserts two other assignments of error in the preservation portion of his brief. First, defendant asserts that the trial court erred in failing to prevent the prosecutor from arguing during the penalty proceeding that the jury was the conscience of Alamance County. The prosecutor merely reminded the jury that it was the voice and conscience of the community. Based on our holding in *State v. Artis*, 325 N.C. 278, 330, 384 S.E.2d 470, 499-500 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991), that "it is not improper to remind the jury . . . that its voice is the conscience of the community," we find no error.

**[25]** Defendant also asserts under this assignment of error that the trial court erred in failing to prevent the prosecutor from arguing during the penalty proceeding that "[t]here is no limit to the number of . . . nonstatutory mitigating circumstances that could be submitted." In *State v. Harris*, 338 N.C. 129, 148-49, 449 S.E.2d 371, 379 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 752 (1995), we held that the prosecutor's argument "that he was limited in the circumstances which he could submit justifying the imposition of the death penalty, while there was no limit except that of their own imagination as to what the defendant's attorney[s] could submit in mitigation of his punishment . . . was not so grossly improper that the conviction was a denial of due process." Based on our holding in *Harris*, we overrule defendant's assignment of error.

Finally, defendant contends the North Carolina death penalty procedure is unconstitutional. We continue to uphold our prior rulings on this issue and overrule this assignment of error. *Payne*, 337 N.C. at 535, 448 S.E.2d at 111; *see State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

## PROPORTIONALITY REVIEW

**[26]** Having concluded that defendant's trial and separate capital sentencing proceeding were free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have thoroughly examined the record, transcripts, and briefs in the present case and conclude that the record

STATE v. BURR

[341 N.C. 263 (1995)]

fully supports the aggravating circumstance found by the jury, that the killing was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (Supp. 1994). Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must then turn to our final statutory duty of proportionality review.

"Proportionality review is designed to 'eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Miller*, 339 N.C. at 692, 455 S.E.2d at 153 (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983); *accord* N.C.G.S. § 15A-2000(d)(2). We cannot conclude based on the record that the imposition of the death penalty in this case is aberrant or capricious.

This case is distinguishable from those cases in which this Court has found the death penalty disproportionate. In three of those cases, *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of premeditation and deliberation. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), defendant shot the victim while trying to shoot a different person with whom he had argued. The only aggravating circumstance found in *Rogers* was that it was part of a course of conduct which included the commission of other violent crimes. In the present case, an infant was cruelly and violently murdered by being shaken and beaten to death. Defendant, being the mother's boyfriend, violated a position of trust, as the infant was helpless and defenseless to resist this senseless crime. The facts of the case are clearly distinguishable from *Rogers* and involve a much more brutal killing.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the two aggravating circumstances found were pecuniary gain and committed in the commission of a robbery. In finding the death sentence disproportionate, this Court focused on the fact that there was no finding that defendant was engaged in a course of conduct including other violent crimes or that it was especially heinous, atrocious, or cruel. The present case is distinguishable from *Young* because, among other things, in this case the jury found the aggravating circumstance that it was especially heinous, atrocious, or cruel.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), a police officer was shot with his own gun while he and defendant struggled on the ground. The only aggravating circumstance found by the jury was that the offense was committed against a law enforcement officer engaged in the performance of his official duties. In the present case, the jury found that the murder was especially heinous, atrocious, or cruel, and once again, the facts in this case are clearly distinguishable from *Hill*.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), several friends were riding in a car when defendant began taunting the victim by telling him that he would shoot him. Defendant eventually shot the victim and then immediately drove to the emergency room of the local hospital. While the jury found both that the murder was especially heinous, atrocious, or cruel and that it was part of a course of conduct including other violent crimes, this Court focused on defendant's attempt to obtain medical assistance in finding the death sentence disproportionate. Here, defendant refused to take the infant to the hospital until the infant's mother threatened to call an ambulance. Then, instead of rushing the infant to the hospital, defendant stopped for gas. Thus, the facts of this case are clearly distinguishable from the facts in *Bondurant*.

We recognize that juries have imposed sentences of life imprisonment in certain cases involving the death of an infant. However, "the fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review." *Green*, 336 N.C. at 198, 443 S.E.2d at 46.

Defendant in the present case refers us to two cases, other than the ones we have already discussed, in which juries following capital sentencing proceedings recommended life sentences. These cases are

clearly distinguishable from the present case on their facts. In *State v. Huff*, 328 N.C. 532, 402 S.E.2d 577 (1991), this Court found sufficient evidence from which a reasonable juror examining defendant's behavior and mental problems could conclude that defendant's capacity to appreciate the criminality of his conduct was impaired. Such was not the case here. Further, in *Phillips*, 328 N.C. 1, 399 S.E.2d 293, defendants were sixty-eight and fifty-seven years old, and premeditation and deliberation were not elements of the offense as charged. Here, defendant was thirty-two years old, and he was convicted of the premeditated and deliberated murder of a four-month-old child.

Further, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have *consistently* returned recommendations of life imprisonment. *E.g., State v. Spruill*, 338 N.C. 612, 452 S.E.2d 279 (1994) (murder of an acquaintance in which the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel—death sentence proportionate), *petition for cert. filed,* —— U.S.L.W. —— (No. 94-9410, 19 May 1995); *Syriani*, 333 N.C. 350, 428 S.E.2d 118 (murder in which the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel and in which defendant was convicted solely under the theory of premeditation and deliberation—death sentence proportionate); *Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (murder of elderly female in which the jury found the only aggravating circumstance to be that the murder was especially heinous, atrocious, or cruel—death sentence proportionate).

After comparing this case carefully with all others in the pool used for proportionality review, we conclude that it falls within the class of first-degree murders in which we have previously upheld the death penalty. For the foregoing reasons, we conclude that the sentence of death entered in the present case is not disproportionate.

Having considered and rejected all of defendant's assignments of error, we hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. Comparing this case to similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. Therefore, the sen-

tence of death entered against defendant must be and is left undisturbed.

NO ERROR.

Justice WHICHARD concurring in the result in part.

On issue XX, I do not agree that the prosecutor did not misstate the law in his explanation of Issue Three of the capital sentencing proceeding. For the reasons stated in Justice Frye's dissenting opinions in *McCarver* and *McLaughlin*, both filed simultaneously herewith, I believe the prosecutor's statement that the jury must be unanimous to answer Issue Three in the negative was incorrect.

In this case, however, unlike in *McCarver* and *McLaughlin*, the misstatement was by the prosecutor, not the judge. Further, there was no objection to the statement at trial, so the standard of review is whether the error was so egregious as to require the trial court to intervene *ex mero motu*. I do not believe the misstatement rose to that level, nor do I believe that, in the total context presented, there is any serious possibility the statement had an effect on the jury's decision. I therefore concur in the result reached on this issue in the opinion for the Court, though disagreeing with the reasoning.

Justice FRYE joins in this concurring opinion.